## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JUANITA SILVERA, derivatively on behalf of PARETEUM CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT H. TURNER, EDWARD O'DONNELL, DENIS MCCARTHY, VICTOR BOZZO, LUIS JIMENEZ-TUÑON, ROBERT LIPPERT, ROB MUMBY, LAURA THOMAS, and YVES VAN SANTE,<br><br>Defendants,<br><br>and<br><br>PARETEUM CORPORATION,<br><br>Nominal Defendant. | CIVIL ACTION NO. _____<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **VERIFIED STOCKHLDER DERIVATIVE COMPLAINT**

Plaintiff Juanita Silveria ("Plaintiff"), by and through her counsel, derivatively on behalf of Nominal Defendant Pareteum Corporation ("Pareteum" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and beliefs are based upon, among other things, her counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Pareteum with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Pareteum; (iii) a class action

lawsuit filed in the United Stated District Court for the Southern District of New York ("S.D.N.Y.") against Pareteum Corporation, and defendants Robert H. Turner ("Turner"), Denis McCarthy ("McCarthy"), Victor Bozzo ("Bozzo"), and Edward O'Donnell ("O'Donnell") captioned *Mansur v. Pareteum Corporation*, Case No. 1:19-cv-09849, alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between December 14, 2017, and October 21, 2019 (the "Relevant Period"), with respect to Pareteum's purported financial success (the "Securities Class Action"); and (iv) other publicly available information, including media and analyst reports, concerning Pareteum.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder brought on behalf of Nominal Defendant Pareteum against certain officers and members of the Company's Board of Directors (the "Board").

2.     Pareteum is a publicly traded worldwide mobile networking software and services company.  The Company offers solutions for mobile virtual network operators.

3.     This action arises from the Individual Defendants' material misrepresentations and omissions regarding Pareteum's true business operations and financial results.  The Individual Defendants presented Pareteum as a "rapidly growing Cloud Communications Platform company" that was poised for exponential growth due to the Company's involvement

2

in block chain technology, customer wins, a rising "36-month contract revenue backlog," and effective contract conversion rates.

4.     The Individual Defendants were able to increase Pareteum's market capitalization twenty-fold between 2016 and 2019 by portraying the Company as "high growth" in a barrage of press releases and social media posts touting its new customers and purported multi-million-dollar contracts.

5.     The Company's press releases described it as a rapidly growing global cloud software communications platform company with a mission to connect "every person and every thing."  The Individual Defendants also touted a "36 month contract revenue backlog" (reaching $900 million) and promoted the Company's conversion rate of contract value and reported revenue growth.  The Individual Defendants leveraged this "good" news to acquire at least two companies – Artilium plc ("Artilium") and iPass Inc. ("iPass").

6.     As one would expect, analysts focused on the Individual Defendants' upbeat claims regarding the Company's "36-month contract revenue backlog."

7.     On December 20, 2018, a Northland Capital Markets analyst report stated that "[o]ver the past 12 months, Pareteum has won 90+ deals.  In the prior 3.5 years, the company had signed no new deals.  The company has also been adding $10+ million in ACV per quarter, and 3-year backlog has also grown dramatically to several hundred million dollars."  The report added that, "[a]s Pareteum deploys its organic backlog and the overall company scales, Pareteum sees the ability to reach 70% gross margin again on the combined Pareteum/Artilium business." Similarly, a January 11, 2019, analyst report from Maxim Group recounted, "TEUM has over

$500M in three-year contracted revenue backlog, which provides strong visibility for revenue growth."

8.      The Individual Defendants' tale hooked analysts and outside investors.  As noted in a *Seeking Alpha* article, "Pareteum (TEUM-NASD) has been one of the best performing stocks of 2019 so far – up an astounding 300%+ in the last two and a half months.  (Sure beats oil stocks, and that's why I'm looking here.)  I've watched the run – and the chart has been tempting . . . one of my market lines is:  At The End Of the Day, it's The Tape That Matters.  Price.  And the stock has done fabulously well."

9.      However, the Individual Defendants' representations regarding the Company's business operations and financial prospects were all lies.  The Individual Defendants' statements regarding great customer wins and multimillion-dollar contracts involved fake entities, related third parties, or companies so small they had no chance of ever satisfying the value the Individual Defendants assigned to their contracts.  Moreover, the Individual Defendants misstated or manipulated the Company's 36-month contract revenue backlog and revenue conversion metrics, allowing for the premature recognition of revenue.  This resulted in inflated revenue and accounts receivable numbers in violation of Generally Accepted Accounting Principles ("GAAP").

10.     Then, on June 7, 2019, research firm Marcus Aurelius Value exposed the scheme created by the Individual Defendants.  On that day, Marcus Aurelius Value issued a report (the "Marcus Aurelius Value Report") describing the Company's "massive downside potential" and noting its belief that "the stock is completely uninvestible."  On the news of the Marcus Aurelius Value Report, Pareteum's stock dropped 24%, going from $3.39 per share to close at $2.58 the same day.

11.     The Individual Defendants immediately circled the wagons, and vehemently denied the truths contained in the Marcus Aurelius Value's Report, dismissing its findings as an "attack by short sellers" attempting to drive down Pareteum's stock price.

12.     However, on the heels of the Marcus Aurelius Value's Report, on June 25, 2019, a second research firm, Viceroy Research ("Viceroy"), issued a report (the "Viceroy Report") (together with the Marcus Aurelius Value's Report, the "Reports")[1] reiterating many of the findings from the Marcus Aurelius Value report.  Among the information reiterated by Viceroy: (1) several of Pareteum's partner entities were either nonexistent, insolvent or lacked sufficient resources to satisfy reported contract values, "leading us to believe that they are Pareteum customers who are unable to pay or have no operations"; and (2) "Pareteum's 36-month contractual backlog measurement is not an accurate predictor of future profits."  The Viceroy Report concluded by saying "[a]fter our investigation we believe this growth story is completely broken and may not have ever existed at all."

13.     The Viceroy Report again caused the Company's stock to decline, going from $2.47 per share on June 25, 2019, to $2.00 per share at the close of trading on June 26, 2019.

14.     On June 27, 2019, the Individual Defendants again denied the findings of the Reports, claiming that the Reports "misrepresent[ed] facts" and made "spurious claims" against the Company.

15.     Unfortunately for the Company and its shareholders, the claims of the Reports carried substance.  On August 26, 2019, running low on cash, the Company announced that it

---

[1]   "Aurelius Report" refers to TEUM:  Where Are The Customers?, Marcus Aurelius Value (June 7, 2019), http://aureliusvalue.com/research/teum- where-are-the-customers. (hereinafter "Aurelius Report").  Viceroy Report refers to Parateum – The Wild West of Telecoms, Viceroy Research (June 25, 2019), https://viceroyresearch.org/2019/06/26/pareteum-the-wild-west-of-telecoms/

was forced to amend its credit agreement with senior creditor Post Road to get access to an additional $2.5 million. Access to these funds came at a price to the Company's shareholders as Pareteum had to issue 750,000 shares to Post Road on August 22, 2019, and an additional 250,000 shares on November 15, 2019, thereby seriously diluting existing shareholders.

16.     But that wasn't the end of the Company's problems. On October 16, 2019, the Individual Defendants announced the sudden and unexplained termination of Pareteum's Chief Operating Officer ("COO") defendant McCarthy, who had been "deeply involved" with the Company's "contract backlog" metric. The Individual Defendants also disclosed that Pareteum had retained an executive search firm to assist with "assessing the board of directors and key leadership positions," signaling the departure of other high-level Company officials.

17.     At the same time, media reports began to circulate that Pareteum investors would "need to prepare for another disappointing quarterly report with ongoing, material cash burn and management potentially reducing future growth expectations." This news caused the Company's stock to drop 25%, from $1.13 per share on October 16, 2019, to $0.83 at the close of trading on October 17, 2019.

18.     On October 21, 2019, the Individual Defendants scheme was completely exposed with the announcement that Pareteum needed to restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019, and June 30, 2019. Per the Individual Defendants, "[t]he decision to restate these financial statements is based on the Company's conclusion that certain revenues recognized during 2018 and 2019 should not have been recorded during that period. For certain customer transactions, the Company may have prematurely or inaccurately recognized revenue."

19.     Throughout the Relevant Period, the Individual Defendants made false and misleading statements regarding the Company's customers, contracts, backlog and revenue resulting in the restatement of the Company's financial statements and inflated revenue and accounts receivable numbers in violation of GAAP.

20.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law, Pareteum has sustained damages as described below.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Pareteum is incorporated in this district. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

26.     Plaintiffs are current shareholders of Pareteum common stock and have continuously held Pareteum common stock at all relevant times.

27.     Nominal Defendant Pareteum is organized under the laws of the State of Delaware, and purports to maintain its principal place of business at 1185 Avenue of the Americas, 37th Floor, NY, NY 10036.[2] Pursuant to the Form 10-Q filed with the SEC on August 9, 2019:

> Pareteum has developed a Communications Cloud Services Platform, providing (i) Mobility, (ii) Messaging, and (iii) Security services and applications, with a Single-Sign-On, API and software development suite. The Pareteum platform hosts integrated IT/Back Office and Core Network functionality for mobile network operators, and for enterprises implement and leverage mobile communications solutions on a fully outsourced SaaS, PaaS and/or IaaS basis: made available either as an on-premise solution or as a fully hosted service in the Cloud depending on the needs of our customers. Pareteum also delivers an Operational Support System ("OSS") for channel partners, with Application Program Interfaces ("APIs") for integration with third party systems, workflows for complex application orchestration, customer support with branded portals and plug-ins for a multitude of other applications. These features facilitate and improve the ability of our channel partners to provide support and to drive sales.

28.     The Company was formerly known as Elephant Talk Communications Corp. ("Elephant Talk") but changed its name to Pareteum Corporation in November 2016.

29.     Defendant Turner served as the Executive Chairman of the Board from November 16, 2015, and the Company's Chief Executive Officer ("CEO") from May 24, 2019, until his termination from those positions on November 22, 2019. For the fiscal year ended December 31,

---

[2]  On September 6, 2017, Sichenzia Ross Ference Kesner LLP ("SRFK"), Pareteum's outside counsel, issued a press release announcing that it had relocated its headquarters to the full floor at 1185 Avenue of the Americas, 37th Floor, New York, NY 10036. It is unclear if Pareteum's operations are run out of its attorney's offices or if this is simply a mail-drop and service address. Pareteum has provided no explanation.

2018, defendant Turner received $5,281,843 in compensation from the Company. This included $321,225 in salary, a $600,000 bonus, $2,921,563 in bonus stock awards, and $1,439,055 in all other compensation.

30.     Defendant O'Donnell served as the Company's Chief Financial Officer ("CFO") from January 9, 2017 until November 1, 2019. On November 1, 2019, defendant O'Donnell was replaced by defendant Thomas as interim CFO  For the fiscal year ended December 31, 2018, defendant O'Donnell received $437,948 in compensation from the Company. This included $212,197 in salary, a $60,000 bonus, $151,397 in option awards, and $14,354 in all other compensation.

31.     Defendant McCarthy served as the Company's COO from May 24, 2019, until he was terminated on October 9, 2019. Previously, he served as President of the Company from October 1, 2018 until May 24, 2019. For the fiscal year ended December 31, 2018, defendant McCarthy received $354,192 in compensation from the Company. This included $198,509 in salary, $138,021 in option awards, and $17,662 in all other compensation.

32.     Defendant Bozzo has served as the Company's Chief Commercial Officer ("CCO") since May 24, 2019. Previously, he served as CEO of the Company from November 1, 2016 until May 24, 2019. For the fiscal year ended December 31, 2018, defendant Bozzo received $2,161,536 in compensation from the Company. This included $293,162 in salary, a $325,000 bonus, $687,788 in bonus stock awards, $460,064 in option awards, and $395,521 in all other compensation.

33.     Defendant Luis Jimenez-Tuñon ("Jimenez-Tuñon") has served as a Company director since March 1, 2017. He also serves as the Chair of the Board's Compensation

Committee, and as a member of its Audit and Finance Committee and its Nominating and Corporate Governance Committee.  For the fiscal year ended December 31, 2018, defendant Jimenez-Tuñon received $380,009 in compensation from the Company.  This included $40,000 in fees earned or paid in cash, $437,758 in stock awards[3], and $97,749 in non-qualified deferred compensation earnings.

34.     Defendant Robert Lippert ("Lippert") has served as a Company director since November 16, 2018.  He also serves as the Chair of the Board's Audit and Finance Committee, and as a member of its Compensation Committee and its Nominating and Corporate Governance Committee.  For the fiscal year ended December 31, 2018, defendant Lippert received $19,899 in compensation from the Company, which consisted entirely of non-qualified deferred compensation earnings.

35.     Defendant Rob Mumby ("Mumby") has served as the Company's Chief Revenue Officer since April 2017.

36.     Defendant Thomas has served as the Company's interim CFO since November 1, 2019.  Previously, she served as a Company director from July 25, 2017, until she resigned on November 28, 2018.  She has also served as a member of the Company's corporate development and investor relations team since December 2018.  For the fiscal year ended December 31, 2018,

---

[3] The Company's 2019 Proxy Statement stated the following with respect to stock awards granted by the Company to its directors:  "[c]ompensation to the directors can be elected by the directors, at the beginning of the quarter, either in cash or in shares.  When directors opt for payment in shares there is a 25% discount on the 'purchase' price.  The amounts however are shown at fair market value at the date of delivery.  In principle non-executive officer directors might earn up to approximately 33% more than the standard director fees if they have elected to receive 100% compensation in shares."

defendant Thomas received $211,948 in compensation from the Company.  This included $181,054 in fees earned or paid in cash, $47,002 in stock awards, $31,941 in option awards, and $48,048 in non-qualified deferred compensation earnings.

37.     Defendant Yves van Sante ("van Sante") has served as a Company director since June 1, 2014.  He also serves as the Chair of the Board's Nominating and Corporate Governance Committee, and as a member of its Audit and Finance Committee and its Compensation Committee.  For the fiscal year ended December 31, 2018, defendant van Sante received $324,949 in compensation from the Company.  This included $129,851 in fees earned or paid in cash, $237,865 in stock awards, and $42,767 in non-qualified deferred compensation earnings.

38.     The defendants referenced above in ¶¶ 29-37 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Pareteum were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

42.      Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43.      In addition, the Company has adopted a Code of Business Conduct (the "Code").[4]

44.      The first paragraph of the Code states:

Pareteum Corporation (the "Company") is committed to conducting the business to high standards.  We have adopted this Code of Business Conduct (herein referred to as "the Code") to ensure all employees ("employees" are deemed to include persons or legal entities who have a longer contractual relationship with the Company or its affiliates to deliver services in person) and affiliates are well aware of what is expected from them.

---

[4]  The Code was amended and approved by the Board on February 9, 2015.

45.    The Code goes on to state:

**LEGAL COMPLIANCE AND THE CODE**

The Company actively promotes compliance with all laws, rules and regulations in each jurisdiction in which we do business.

On top of legal compliance, the Code puts additional requirements on all of us. We place particular demands on our managers.  They must, through their actions demonstrate the importance of compliance with the Code.  Leading by example is critical, acting on any suspected unethical behaviour, as well as being available for employees who have ethical questions or wish to report possible violations.

Similar to breaking laws resulting in disciplinary action by society, failure to comply with the Code will result in disciplinary action by the company, including dismissal.

\*       \*       \*

**FINANCIAL REPORTING**

As a public company it is necessary that the Company's filings with the United States Securities and Exchange Commission are accurate and timely.   The Company has appropriate internal controls and processes to ensure that accounting and financial reporting complies with applicable legislation and rulings.

The Company expects employees and officers to take this responsibility very seriously and provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

The Company's policy is to comply with all financial reporting and accounting regulations and rulings applicable to the Company if any employee or officer has concerns or complaints regarding accounting or auditing matters of the Company, then he or she is encouraged to file those concerns by one of the methods described in chapter Reporting Violations.

The integrity of the Company's financial records is critical to the operation of the Company business and is a key factor in maintaining the confidence and trust of our shareholders.  We must ensure that all transactions are properly recorded, classified and summarized in accordance with the Company accounting policies. No employee may enter or remove information of the Company's books or records that intentionally hides, misleads or disguises the true nature of any financial or non financial transaction or result.

Employees involved in financial reporting shall always provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, government agencies, tax authorities and in other public communications.

Comments about financial performance and prospects to external parties shall only be made by authorized official spokespersons.

46.     Furthermore, as noted in the Company's DEF 14A filed with the SEC on June 6, 2019 (the "2019 Proxy"):

### *Code of Conduct*

We have adopted a code of conduct that outlines the principles, policies and laws that govern our activities and establishes guidelines for conduct in the workplace. The code of conduct applies to all employees, as well as each member of our Board of Directors.  All employees are required to read the code of conduct and affirm in writing their acceptance of the code.  Our code of conduct is posted on our website, www.Pareteum.com.  We intend to satisfy any disclosure requirement under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of our code of conduct by posting such information on our website, www.Pareteum.com.  A copy of our code of conduct is also available in print, without charge, upon written request to Pareteum Corporation, 1185 Avenue of the Americas, 37th Floor, New York, NY 10036, Attn: Corporate Secretary.

47.     Moreover, the Board's Audit and Finance Committee (the "Audit Committee"), which is and has comprised defendants van Sante, Jimenez-Tuñon, and Lippert during the Relevant Period, has a heightened duty under the Audit Committee Charter, which states:

The primary role of the Committee is to oversee the financial reporting and disclosure process.   To fulfill this obligation, the Committee relies on: management for the preparation and accuracy of the Company's financial statements; for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls.

\*        \*        \*

The Committee shall have the following authority and responsibilities:

At least annually, to obtain and review a report by the Company's independent auditors that describes (1) the accounting firm's internal quality control procedures, (2) any issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audit's carried out by the firm and any steps taken to deal with any such issues, and (3) all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors.

To review and discuss with the Company's independent auditors (1) the auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, (3) the scope and timing of the annual audit, (4) any significant risks identified during the auditors' risk assessment procedures and (5) when completed, the results, including significant findings, of the annual audit.

To review and discuss with the Company's independent auditors (1) all critical accounting policies and practices to be used in the audit; (2) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors; and (3) other material written communications between the auditors and management.

To review with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements.

To keep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the company; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

To review with management, and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

To review and discuss with the Company's independent auditors any other matters required to be discussed by PCAOB Auditing Standards No. 1301, Communications with Audit Committees, including, without limitation, the auditors' evaluation of the quality of the company's financial reporting, information relating to significant unusual transactions and the business rationale for such transactions and the auditors' evaluation of the company's ability to continue as a going concern,] and other applicable requirements of the PCAOB and the SEC.

To review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed.

To recommend to the Board that the audited financial statements and the MD&A section be included in the Company's Form 10-K and whether the Form 10-K should be filed with the SEC; and to produce the audit committee report required to be included in the Company's proxy statement.

To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed; and to review and discuss the Form 10-Q for filing with the SEC.

To review, with the General Counsel and outside legal counsel, legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries, that could have a significant impact on the Company's financial statements.

To review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) and any other potential conflict of interest situations on an ongoing basis, in accordance with Company policies and procedures, and to develop policies and procedures for the Committee's approval of related party transactions.

48.     As noted in the 2019 Proxy:

The Audit Committee oversees our corporate accounting, financial reporting practices and the audits of financial statements.  For this purpose, the Audit and Committee has a charter (which is reviewed annually) and performs several functions.  The Audit Committee:

- evaluates the independence and performance of, and assesses the qualifications of, our independent auditor, and engages such independent auditor;

- approves the plan and fees for the annual audit, quarterly reviews, tax and other audit-related services, and approves in advance any non-audit service to be provided by the independent auditor;

- reviews and approves related-party transactions;

- monitors the independence of the independent auditor and the rotation of partners of the independent auditor on our engagement team as required by law;

- reviews the financial statements to be included in our Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and reviews with management and the independent auditors the results of the annual audit and reviews of our quarterly financial statements;

- oversees all aspects our systems of internal accounting control and corporate governance functions on behalf of the Board of Directors; and

- provides oversight assistance in connection with legal, ethical and risk management compliance programs established by management and the Board of Directors, including Sarbanes-Oxley implementation, and makes recommendations to the Board of Directors regarding corporate governance issues and policy decisions.

49.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in, *inter alia,* the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## SUBSTANTIVE ALLEGATIONS

### A.  Company Background

50.     By 2015, Elephant Talk, Pareteum's successor, was just another struggling international telecommunications software and services provider.  In November 2015, defendant Turner was appointed as the Company's Executive Chairman, which quickly lead to a series of restructuring efforts, including its name change (to Pareteum), personnel and management changes, including the appointment of Defendant Bozzo as CEO, and on February 27, 2017, a 1-for-25 reverse split of its common stock.

51.     Pareteum's Global Cloud Communications Platform software mainly targets mobile service and telecommunications providers, primarily Mobile Virtual Network Operators ("MVNO").  A MVNO provides wireless communications to customers; a MVNO does not own any network infrastructure so it rents bandwidth from large carriers like AT&T.  Similarly, rather than develop its own software for operations and business support systems, MVNOs purchase those products from companies like Pareteum.

52.     The Individual Defendants regularly used and reported the Company's "36 Month Contract Revenue Backlog" as an internal metric (also referred to as "36MCRB," hereinafter "Backlog"). 36 Month Contract Revenue Backlog is defined as:

> Contractual revenue backlog, a Non-GAAP measure is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers.

53.     Following defendants Turner and Bozzo's "restructuring," the Company's market cap grew from less than $20 million in December 2016 to as high as $569 million in May 2019, on the back of well over 200 press releases issued by the Individual Defendants on behalf of the Company touting the Company's purported capabilities and growth.

54.     During the Relevant Period, the Company's reported revenues, at least based on the press releases issued by the Individual Defendants, grew rapidly, and by May 2019 the Individual Defendants announced that the Company's Backlog was approaching $1 billion.

**B.    Undisclosed Connections**

55.     At no time during the Relevant Period did Pareteum disclose the complete backgrounds of certain officers, directors, managers, and significant investors of the Company, nor did Pareteum reveal allegations of fraud and stock manipulation by senior executives of the Company, including Defendants Turner and O'Donnell, and the connections of Pareteum and its senior managers and large investors with a notorious stock fraud pump-and-dump stock manipulator named Barry Honig ("Honig"), who has been a defendant in lawsuits and investigations by the SEC and the Department of Justice.[5]

---

[5] On June 10, 2019, Honig entered a settlement with the SEC whereby he agreed to be banned from the business of investing in and financing publicly traded small cap companies.  U.S. District

56.     Similarly, no disclosure was made regarding defendants Turner and McCarthy's association with now worthless Catcher Holdings, Inc., another company with ties to Honig.

57.     Upon information and belief, Honig also has ties to:  (1) SRFK, which serves as legal counsel to Pareteum, and which has connections to other Honig-related companies; (2) Iroquois Capital and IntraCoastal Capital who regularly invest in companies owned by Honig and who, in March 2018, owned or controlled approximately 13.2% of the Company's outstanding shares; and (3) Dawson James Securities, Inc. ("Dawson James") who acted as a placement agent in several Honig-related deals and who has acted as placement agent for Pareteum.

58.     Investors would only know these facts in June of 2019 from the Reports.

## C.  The Individual Defendants' Materially False and Misleading Statements Made During the Relevant Period

59.     On December 14, 2017, the Company, at the direction of the Individual Defendants, published a Shareholder Update Letter which stated, in pertinent part, "[*the Company's] restructuring and repositioning in 2016 has led to solid growth in 2017*, and has defined our innovation in both services and market positioning, establishing a *strong outlook for our success in 2018 and beyond[,]*" and thanked Pareteum investors for their patience.[6]

60.     This shareholder letter further provided that "*2017 Accomplishments Expected to Create Continued Growth and Market Innovations in 2018*" and that "*36 Month Contractual Revenue Backlog Grows to $129 Million at November 30, 2017.*" (italics  in  original).

---

Court Judge Edgardo Ramos approved this settlement on July 10, 2019.  The settlement stemmed from an action brought in September 2018 in the S.D.N.Y. against Honig for his role as the leader of a pump-and-dump securities fraud scheme dating back to 2013.

[6] Unless otherwise indicated, original source emphasis (bolding, underlines, and/or italics) has been removed, and all emphasis in this complaint has been added.

61.     On December 19, 2017, the Company published a press release quoting defendant

Turner and announcing that on the prior day, December 18, 2017, the Company eliminated senior

secured debt and "substantially improve[d] cashflow." This press release stated, in pertinent part:

> "Our successful debt repayment is one of the key elements of the corporate
> turnaround at Pareteum which began in Q4 2015. *This debt financing package,*
> *originally implemented by the Company's former management, was no longer*
> *optimized for the exciting value-generating and growth stage of our business plans.*
> We thank the Lenders for their support during the challenging restructure period.
> *We also look forward to focusing on the continued sales surge by making*
> *investments in the business which we expect to deliver maximum value for our*
> *equity investors*."

62.     On the same date, the Individual Defendants published a PowerPoint presentation,

which provided that the Company issued over $13 million in new 36 month contractual revenue

Backlog and highlighted that the Company's "**[p]ath to profitability** is accelerated via **high**

**margins** on subscribers and **the magic of monthly recurring revenue** will drive **sustainable**

**returns**[.]" (Emphasis in original).

63.     On January 31, 2018, the Company, once again at the direction of the Individual

Defendants, published a press release announcing that it "*Continues Momentum via Highly*

*Successful January 2018*" by adding $15,200,000 to its Backlog. This press release provided, in

pertinent part:

> [D]uring the month of January 2018, the Company signed contracts scheduled to
> add $15,200,000 to its 36-month contractual revenue backlog. The current
> contractual revenue backlog represents a 400% increase from a year earlier and a
> *10% month over month increase to the $147,000,000 36-month contractual*
> *revenue backlog announced previously on January 3, 2018*.
>
> Pareteum's current cash balance is $15.6 million on January 31, 2018, reflecting
> having fully paid our senior secured loan, in the amount of $8.1 million, and,
> continuing the improved operations of the business. Increases in cash balances over
> prior periods are a result of net equity raised, warrant exercises and continued

operational efficiencies. *The improved strength of our balance sheet provides the foundation for Pareteum's focus on accelerated growth in 2018 and beyond.*

Contracts executed in January 2018 that have meaningfully contributed to Pareteum's accelerating growth, as measured by our 36-month contractual revenue backlog, are:

- $1,000,000 contract from Social Media Provider to Enable Smartphone Services, announced January 4, 2018

- $5,400,000 contract from Pan European Mobile Operator with African Subscribers, announced January 10, 2018

- $3,000,000 contract from South America Data Network Provider to Add Mobility, announced January 17, 2018

- $1,000,000 contract from Brazil Mobile Service Provider, announced January 24, 2018

- $10,000,000 contract awarded to Pareteum Europe for MSP deployment to EMEA customer, announced January 26, 2018[.]

64.     Defendant Turner once again touted Pareteum's growing Backlog in this press release, stating: "*Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog*, *currently standing over $162,000,000 which represents a Compound Annual Growth Rate (CAGR), measured from the end of 2016's fourth quarter through 2017 of 400%!* . . ."

65.     Defendant Turner's web of lies continued on February 12, 2018, when he issued a letter to shareholders which stated, in pertinent part:

The TEUM of Pareteum Corporation continues to be hard at work, globally. *We have had a fast start to 2018 with excellent results in January* through the collective group initiatives of:

- Rob Mumby + his key sales executives and sales support TEUM;
- Ali Davachi + his key operations, technical support and service delivery TEUM;

- [Defendant] Denis McCarthy + his key corporate development TEUM;
- [Defendant] Ted O'Donnell + his accounting and finance TEUM
- And, as always, [defendant] Vic Bozzo and his indomitable leadership, especially in the sales arena, to make things happen;

I am happy to report that our executive team, with its key leadership management team, is continuing to produce results. *We have a very big and bright 2018 planned. So far this year, in January alone, our TEUM signed $20.4 million of new contracts, spanning the globe, from Brazil to Africa to Europe.  $15.2 million was additive to our now record high $162 million 36-month contractual revenue backlog*, as two of the awarded contracts are 5-year agreements.  I am extremely proud of our TEUM's accomplishments as *we have accelerated the growth of our backlog from $60 million at June 30, 2017 to $162 million as of January 31, 2018.  We expect the pace to accelerate during the year and that our reported results will reflect the hard work that has gone into the turnaround of our company*.

\* \* \*

*We are proud to be debt-free with substantial cash to operate and grow our business.  We are putting these dollars to work throughout 2018 (and beyond) in a manner that we believe will yield the maximum shareholder value* to TEUM through:

- Profitable Sales growth
- Product and services development, with a detailed build or buy analysis applied

*Pareteum continues to win new long-term contractual business at an unprecedented pace, as evidenced by our 36-month contractual revenue backlog. We expect this pace to increase throughout the year . . . .*

66.     Defendant Turner's letter to the Company's shareholders also contained a link to a presentation which included the following graphic once again touting Pareteum's Backlog:

24



67.     On the same date, February 12, 2018, the Individual Defendants caused the Company to publish a press release announcing that "Pareteum (NYSEMKT:TEUM) is up 4.8% premarket following a letter from its chairman outlining its start to 2018."

68.     On February 28, 2018, the Individual Defendants caused the Company to publish a press release announcing that the Company secured a "$10 Million Contract from Established Carrier to Launch Global MVNO."  Defendant Bozzo was quoted as saying "*[t]his contract is a major milestone for continued growth.  Being awarded this contract demonstrates that the technology and strategy of Pareteum's turn-key solution for launching mobile network operators is being widely adopted across the globe.*"

69.     On the strength of this press release, Pareteum's common stock traded as high as $2.34 per share on volume of 5.12 million shares, up from the prior day's close of $2.00 per share and 6,479,000 share volume.

70.     On March 21, 2018, the Individual Defendants caused the Company to publish yet another press release, this time announcing that the Company added $10 million to its Backlog via a contract with an Africa-based MVNO.  Defendant Bozzo was once again quoted, this time stating:  "Pareteum's MSP Platform is a perfect fit for the contract with our newest global client.  This part of the world represents high growth in connections as the digital economy takes over.  We are pleased with Rob Mumby and his team as they continue to add customers to our platform."

71.     Pareteum's stock once again got a bump from the press release, trading as high as $3.35 per share with 11.08 million share trading volume, up from the prior day's close of $2.85 per share.

72.     On April 9, 2018, the Individual Defendants caused the Company to publish yet another press release, this time announcing that "[First Quarter] 2018 Revenue Expected At $4.1 Million, a 47% Increase over [First Quarter] 2017."  Defendant Turner was once again quoted in the press release, stating:

> "Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the acceleration in revenues.  This momentum led to a robust first quarter of 2018 with continued year-over-year growth expected throughout the year.  This momentum is a result of our success in converting our contract revenue backlog into connections which generates revenues."

73.     The Individual Defendants caused the Company to follow this up with a press release on May 7, 2018, announcing "record" results for the first quarter 2018, for the period ending March 31, 2018.  The press release reiterated "Revenues of $4.113 Million, up 47% Year-Over-Year," noting the following "Key Business Highlights for First Quarter 2018:"

> - *Awarded 14 contracts aggregating to $60 million in total contract value, which added $53 million to 36-month contractual revenue backlog*

- *Increased 36-month contractual revenue backlog from $147 million at 12/31/17 to $200 million*

- *Backlog revenue conversion at 103%*

- *Ended Q1 2018 with 2,200,000 connections, a lead indicator of revenue, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, with an additional conversion increase of 70% versus the expected in the 36-month contract backlog for connections*

74.     The May 7, 2018 press release also quoted Defendant Turner as follows:

This quarter represents a record quarterly revenue milestone since we executed our turnaround and transformed the business in 2016.  I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected.  First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter.  All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations.  *Key performance indicators of connections, backlog conversion, connection values, revenue per employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution.  We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for expected growth and profitability.  Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value*[.]

75.     The May 7, 2018 press release also once again touted the Company's Backlog, stating:  "[b]ased on our 36-month contractual revenue backlog of $200 million, as of March 31, 2018, and 2,200,000 connections, we are raising our 2018 outlook.  The Company now expects 2018 revenue growth of at least 60% over 2017, up from the previous provided guidance of 50%."

76.     Shortly thereafter, on May 11, 2018, Pareteum filed its Form 10-Q quarterly report with the SEC for the first quarter ended March 31, 2018.  The 10-Q was signed and certified by defendants Turner and O'Donnell.  The 10-Q made similar materially false and misleading

statements concerning Pareteum's revenues and customer growth and made the following

statements regarding the Company's controls and procedures:

### **Item 4. Controls and Procedures**

#### *Evaluation of Disclosure Controls and Procedures*

As of March 31, 2018, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

#### *Changes in Internal Control Over Financial Reporting*

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

77.     The May 11, 2018, 10-Q also reported the Company's "Basis of Presentation of

Interim Periods" in part, as follows:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes

thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

78.     Finally, the May 11, 2018, Form 10-Q contained certifications, pursuant to 18 U.S.C. Section 906 of the Sarbanes-Oxley Act of 2002 (hereinafter "SOX"), signed by defendants Turner and O'Donnell that attested to the accuracy and completeness of Pareteum's financial and operational results.

79.     As further outlined below in ¶¶ 151-176 *infra*, the statements made by the Individual Defendants in ¶¶ 59-78 above were each materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following reasons, among others:

a)      At all times during the Relevant Period, it was not true that the Company's purported success was the result of hyper-demand for Pareteum's unique products or exceptional service, or the Company's competent management; but, in fact, the Individual Defendants had manipulated Pareteum's accounting for revenues, income, and the Backlog metric;

b)      At all times during the Relevant Period, the Individual Defendants materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results;

c)      Throughout the Relevant Period, contrary to the Individual Defendants statements, the Company did not have adequate systems of internal operational or financial controls, necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable;

d)      As a result of the foregoing, throughout the Relevant Period the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and

e)      As a result of the foregoing undisclosed conditions, throughout the Relevant Period, the Individual Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by the Individual Defendants.

80.     On July 10, 2018, after a two-month respite, the Individual Defendants got back to spinning their tale of gold.  On that date, the Individual Defendants caused Pareteum to publish a press release announcing:

> [T]hat the Company expects to report revenues of at least $5.75 million which represents approximately 78% growth for the second quarter ended June 30, 2018, as compared to a year ago.  The second quarter's expected 2018 revenues will represent an approximate 40% sequential growth over the first quarter of 2018, demonstrating the strong growth in connections that was previously reported in the first quarter of 2018.

In connection with this press release, defendant Turner was quoted as saying:

> *[We] surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections.  This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our 36 Month Contractual Revenue Backlog.  We see this translating into our best quarter, ever.  We anticipate continued improvement in our results and execution of our long-term strategies, aimed at open mobility and open applications, globally delivered as part of excellent customer experiences in every engagement.*

81.     On August 6, 2018, once again at the direction of the Individual Defendants,

Pareteum published a press release announcing "Record Second Quarter 2018 Results":

**Key Financial Highlights for Second Quarter 2018 Year over Year:**

- *Revenues increased by 85% to $6 million*

*          *          *

**Key Business Highlights for Second Quarter 2018:**

- Awarded 13 contracts aggregating to $55 million in total contract value, which added $55 million to 36-month Contractual Revenue Backlog

- Increased 36-month Contractual Revenue Backlog from $200 million at End of the first quarter of 2018 to $276 million; includes $21 million incremental from existing contracts

- Contractual Revenue Backlog conversion rate at 106%

- Ended the second quarter of 2018 with 2,713,600 Connections, an increase of 225% over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018

(bolded headings in original).  Defendant Turner was also quoted as follows:

The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum as it continues to evolve into a high-growth, software-based, enabling cloud services company.  Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history.  Surpassing $6 million in revenues in the second quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue.  Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs).  It is this combination that is making our services and software the developer community's first choice for connectivity and communications.  We generated positive EBITDA and Net Income, validating the efficient scalability of our business.  We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line.  *Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business*

*execution.  Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value*[.]

82.     On August 13, 2018, Pareteum filed its Form 10-Q quarterly report for the 2018 second quarter ended June 30, 2018, with the SEC.  The Form 10-Q reported unaudited revenues of $6,003,180 for the quarter, representing an 85% increase compared to $3,239,175 for the same period ended June 30, 2017.  This Form 10-Q also once again reported the Company's "Basis of Presentation of Interim Periods" in part, as follows:

> The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X.  They do not include all the information and footnotes required by GAAP for complete financial statements.  Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

> The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods.  The results of operations for the three and six months ended June 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

83.     In addition to signing the August 13, 2018, Form 10-Q, defendants Turner and O'Donnell also signed SOX Certifications, in which they certified and attested to the truth, accuracy, and completeness of the quarterly report.

84.     For the reasons stated above in ¶ 79 *supra*, and as further detailed below in ¶¶ 151-176 *infra*, the statements made by the Individual Defendants in ¶¶ 80-83 above, were each

materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, at that time.

85.     On October 5, 2018, the Individual Defendants caused Pareteum to publish a press release announcing that the Company expected "a minimum of $8 million in third quarter revenues" which "*represent[ed] an approximate 129% growth for the third quarter ended September 30, 2018, as compared to a year ago . . . [and] an approximate 33% sequential growth over the second quarter of 2018, demonstrating the continuing strong increase in connections previously reported in the second quarter of 2018*."

86.     In the October 5, 2018, press release, defendant Turner was quoted as follows:

Pareteum continues to surge through 2018; with our expectation of superior financial and operating results for the third quarter.  Our acceleration in revenues and connections proves it, and there's more to come.  *We are focused on forward momentum, and it is happening as we move into the fourth quarter.  Why?  Because our existing customers are buying more from us and we are signing on new ones.  This sales performance, coupled with our daily-accelerating 36-Month Contractual Revenue Backlog conversion, provides a favorable outlook for our business, even before we complete the operational integration of our newly-acquired Artilium, which is also performing well.  We are in a good place for our company*.

87.     On October 24, 2018, the Individual Defendants prompted Pareteum to publish another press release announcing that the Company had grown its Backlog to $500 million, which "include[d] the backlog incorporated with Pareteum's recent acquisition of Artilium and excludes certain monthly recurring revenue streams deriving from that acquisition for which long-term contracts are not in place."  The press release noted that this Backlog milestone represented "a 1,150% increase year over year since 2016:  at year end 2016, Pareteum announced $40 million 36MCRB; at year end 2017, the company announced $147 million; and now, ten months into this

year, Pareteum has reached $500 million in 36MCRB."   The Company further noted that "[d]uring the same period, Pareteum's quarterly booked revenue increased by 260%."

88.     On November 7, 2018, the Individual Defendants had Pareteum publish a press release announcing "Record Third Quarter 2018 Results":

- Revenues of $8 Million, up 129% Year-Over-Year
- Adjusted EBITDA of $1.8 Million
- Non-GAAP EPS of $0.01
- Raised 2018 Outlook to 100% Revenue Growth
- Dollar-Based Net Expansion Rate of 147%

\*     \*     \*

**Key Financial Highlights for Third Quarter 2018 Year over Year:**

- *Revenues increased by 129% to $8 million*

- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million

- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017

- *Increase in total assets from $10 million to $35 million*

- Cash balance of $18.9 million

- Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017

**Key Business Highlights for Third Quarter 2018:**

- Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog

- *Increased 36-Month Contractual Revenue Backlog from $276 million at end of the second quarter of 2018 to $403 million; includes $72 million incremental from existing contracts*

- *Contractual Revenue Backlog conversion rate at 100%*

- Ended the third quarter of 2018 with 2,903,000 Connections, an increase of 127% over the end of the third quarter of 2017 and 7% higher than the second quarter of 2018

(bolded headings in original).

89.     Defendant Turner was again quoted in the press release:

The quarter ended September 30, 2018, marks our continued evolution into a high-growth, software-based, enabling cloud services company.  Surpassing $8 million in revenues in the third quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue.  Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model.  Subsequent to the end of the third quarter, we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses.  *We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line.  Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution.  Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value*[.]

90.     On November 14, 2018, Pareteum filed its Form 10-Q quarterly report for the third quarter ended September 30, 2018, with the SEC, reporting unaudited revenues of $8,007,734 for the quarter, representing a 129% increase compared to $3,498,688 for the same period ended September 30, 2017.    The Form 10-Q also reported the Company's "Basis of Presentation of Interim Periods" in part, as follows:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X.  They do not include all the information and footnotes required by GAAP for complete financial statements.  Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report

on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods.  The results of operations for the three and nine months ended September 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

91.     In addition to signing the November 14, 2018, Form 10-Q, defendants Turner and O'Donnell also signed SOX Certifications, in which they certified and attested to the truth, accuracy, and completeness of the quarterly report.

92.     For the reasons stated in ¶ 79 *supra*, and as further detailed in ¶¶ 151-176 *infra*, the statements made by the Individual Defendants in ¶¶ 85-91 above were each materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, at that time.

93.     On February 12, 2019, Pareteum closed the tender and exchange offer to complete the acquisition of an entity called iPass in a stock-based acquisition valued at approximately $30 million.   The following day, February 13, 2019, the Company published a press release announcing the acquisition and reporting that it had accepted for exchange all shares of iPass, validly tendered in exchange for 1.17 shares of Pareteum common stock for each share of iPass. The shares accepted represented approximately 66.78% of iPass's outstanding shares of common stock.[7]   The $30 million stock-based acquisition of iPass by Pareteum was effectuated by a Prospectus filed with the SEC on February 13, 2019.

---

[7] According to the press release, Pareteum acquired the remaining outstanding shares of iPass's common stock through a merger of a wholly-owned subsidiary of Pareteum with and into iPass immediately following expiration of the tender offer and acceptance of the iPass shares on

94.     In connection with the iPass acquisition, Pareteum issued 9.865 million shares of common stock to shareholders and 705,000 more shares were granted to employees of the Company.  The allocation of the purchase price was as follows:

|  |  |
|---|---|
| Shares issued to shareholders | $29,253,000 |
| Shares issued to employees | $1,401,000 |
| **Total purchase consideration** | **$30,654,000** |

95.     On February 13, 2019, the Individual Defendants got right back to work by issuing a press release which quoted defendant Turner, in part, as follows:

"We're delighted to announce the completion of our acquisition of iPass.  We will now accelerate as one company with combined software products and services, the expansion of addressable markets and the resulting executive and operating talent.  Our integration with iPass immediately grows our installed Connections base, adding marquee brands to our portfolio of customers, and it also materially enhances our software portfolio of services, and adds global access to the world's largest Wi-Fi network."

96.     On February 14, 2019, the Company published a press release, at the behest of the Individual Defendants, that announced that Pareteum grew "FY2018 36 Month Contract Revenue Backlog to $615M," and "sales surge yields $15 million in new contracts in the final two weeks of the year[.]"  This press release also stated, in pertinent part, the following:

[Pareteum] a rapidly growing global cloud software communications platform company with a mission to connect "every person and every(thing)", today announced that it *closed FY2018 with six new three-year agreements with new and existing customers, worth a total of $15 million.  Combined with previously announced contracts, Pareteum's 36-month contractual revenue backlog now totals $615 million*.  In addition, eight agreements that were announced in November and early December have been launched into production.

---

February 12, 2019.  Following the transaction, iPass shares ceased trading on Nasdaq.

97.     The February 14, 2019 press release quoted defendant Turner, in pertinent part, as follows:

> As demonstrated with our new clients, *Pareteum is starting 2019 stronger than ever, growing and satisfying our customers' needs, innovating at a relentless pace ahead of others*. We are in the business of inspiring and growing towards the future, operating profitably, and recognizing and believing that 'we are all in sales'.

98.     This press release also quoted defendant Mumby, Pareteum's Chief Revenue Officer, as follows:

> "Our strong position at the end of 2018 is exceeded by further strong growth into 2019 and indicates the scale of opportunities open to Pareteum.  We continue to have a strong focus on sales and our service delivery as we launched eight customers in December.  We have never been better positioned to empower businesses with the latest connectivity and cloud platform mobility solutions[.]"

99.     One day later, the Individual Defendants caused the Company to publish another press release announcing that "Sales Momentum [brought] $49 million in 36 Month Contract Revenue Backlog."  This press release stated, in pertinent part, the following:

> [Pareteum] a rapidly growing global cloud software communications platform company with a mission to connect "every person and every(thing)", today announced that it closed twelve agreements in January including new customers as well as upselling to our existing customers.

100.     This press release again quoted defendant Turner, in part, as follows:

> "We love our customers, whether they are simply buying more from us or are new customer relationships deriving value from the significant savings and new revenues we help them generate.  *These new January agreements reinforce how easy it is to do business with [Pareteum]* and is yet another step in our mission to connect every person and "every(thing)" through open mobility and applications everywhere."

101.     The press release also once again quoted Mumby:

> "Pareteum is experiencing great success with developers and enterprises for our cloud software solutions[.] . . .*With the addition of these new agreements, we're confident we will continue accelerating our growth as the market's first choice for*

*cloud software communications solutions, expanding our ever growing reach, empowering businesses worldwide.*"

102.   On February 20, 2019, Pareteum, at the hands of the Individual Defendants,

published yet another press release to announce it had launched "Six Customer Agreements into

Production in January."   This press release quoted defendants Bozzo and Turner, as follows:

"*We continue to move signed customers from our contract backlog into production and revenue generation mode, delivering immediate value*," said [defendant] Bozzo[.] . . .

[Defendant] Turner comments, "*We are rapidly bringing our customers into service production*, enabling them to realize their business plans, creating unique mobility and application software solutions.  *The ability to quickly accomplish all this*, without heavy infrastructure or software development cost, *keeps our customers coming back for more*."

103.   On February 26, 2019, the Individual Defendants published a press release

announcing that they had secured an  additional $50 million credit facility with lender, Post Road

Group (hereinafter, the "Credit Facility").  This press release disclosed that approximately $11

million of the initial draw was to be used to repay debt from Fortress Credit Corporation which

had been assumed by the Company in the iPass transaction.[8]

104.   The February 26, 2019, press release also proved another opportunity for the

Individual Defendants to peddle their story of growth, with defendant Turner, stating:

"During 2018, we showed our ability to convert our contractual revenue backlog into tangible results.  This financing gives us a new currency with which to support our aggressive market consolidation through accretive acquisitions and organic

---

[8]  Additional terms of the Credit Facility were only disclosed in Pareteum's Form 8-K filed on February 26, 2019.  Among other things, these terms and conditions included:  (i) obtaining the consents of certain third-parties prior to any additional loans beyond the initial $25 million; (ii) specified levels with respect to operational and financial covenants; and (iii) requirement to maintain a minimum of $2 million of unrestricted cash, maximum leverage ratios, churn rate and adjusted EBITDA.

growth strategy and improves leverage in the business to respect the value that management places on equity. *The facility will allow us to continue on our current growth trajectory in 2019 and the future*."

105.    The press release further provided:

The credit facility was led by Post Road Group and is a milestone transaction for Pareteum's mission to connect every person and every(thing)™. The credit facility provides financing secured through Pareteum's existing recurring revenue streams from its software as a service platform, as well as its growing intellectual property portfolio. *The transaction enables Pareteum to continue to demonstrate its ability to grow revenues on an organic as well as inorganic basis, globally*.

106.    For the reasons stated in ¶ 79 *supra*, and as further detailed in ¶¶ 151-176 *infra*, the statements made by the Individual Defendants, and contained in ¶¶ 95-102 above were each materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, at that time.

107.    In addition to the foregoing, investors would learn in late August 2019 when the Individual Defendants caused the Company to file for a credit waiver, that Pareteum would have to pay Post Road Group 750,000 additional shares of common stock, thereby diluting investors' ownership of the Company. This was because at that time the Company was in default of the February 2019 Credit Facility due to:

a)    The Company having failed to make even its initial interest payments;

b)    The Company having failed to fulfill it reporting obligations to Post Road Group; and

c)    The Company was unable to obtain and timely deliver the two consent agreements required by the Credit Facility.

108.    As such, the Company was in default and at no time could it access any additional funds. Accordingly, it was also materially false and misleading to represent to investors that the

remainder of the $50 million available thereunder would be available, when Defendants knew or recklessly disregarded that it foreseeably would not.

109. On March 5, 2019, Pareteum issued another press release once again announcing big contract wins, with at least 20 new customers amounting to $30 million in that one month. This press release again quoted defendants Bozzo and Turner:

> [Defendant] Turner commented: "*These new customers have chosen Pareteum because we solve real problems and add immediate value to their operations. This is our "Power of ONE TEUM" – by bringing together Pareteum, Artilium, and iPass, we are delivering innovative, easy to use products and services that are the leading edge of this industry*. This is how we "reimagine communications" everyday. It is our customers, who have been with us for years and continue to buy more services from us, coupled with our newest relationships, who have benefited most from TEUM's growing market momentum and have contributed to our ever expanding service reputation for quality and dependability."

> [Defendant] Bozzo . . . , added: "*Our plan to establish Pareteum as the leader in communications services is progressing well. We are very pleased with the traction over the last month and the growing list of customers who are choosing to partner with Pareteum to deliver innovative communications services*."

110. In anticipation of the Company's March 12, 2019 Fourth Quarter and Full Year 2018 Earnings Call, on March 7, 2019, defendant Turner published a Chairman's Letter to Shareholders, which stated, in pertinent part:

> **Dear Fellow Shareholders,**

> In September 2018 I wrote a THANK YOU to you for your demonstrable support of Pareteum as you approved the Artilium acquisition. At that time, it was clear that you provided your support to us which in turn *affirmed our clear mandate to hyper- accelerate growth in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances* which is how we began our Artilium acquisition. We certainly expect to continue our market disruption, using our software to fuel our ambitions, business plans and strategies.

> \*      \*      \*

*Looking forward, we are a company with ambitious plans for continued growth and profitability.*  On our upcoming earnings call, scheduled for March 12, 2019, you will hear about our 2018 successes that have laid a strong foundation as we set even more challenging 2019 goals.  *Our growth will continue from our current customers who continue to buy more from us.  We will also see many new customers enter our client rosters, and because of our iPass acquisition, we have opened completely new market segments in the enterprise sector.  We fully expect to be the market leader in cloud based communications software as a service, as we execute on our business plan.*

111.    Defendant Turner used the March 5, 2019 press release to condition investors to

believe, in part, the following:

We have been updating you on our progress through our recent press releases, which we will continue to do.  As *we maintain our laser focus on growth* . . .

*We are well positioned now to drive dramatic increases in our scale and become the recognized market leader through the value we create for our customers and shareholders*.  We expect to continue to attract long-term institutional investors who believe in our proven ability to execute our plans and scale the company.  Additionally, you will have read that *we have improved our capital gain plans by the addition of a $50 million debt facility, initially being used to fully repay iPass' approximately $11 million debt on better terms, and which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified.  We also believe that leveraging our business in this way demonstrates management's confidence in our business and equity value.*

As you have heard me say many times, "we are all in sales!" *We are driving hard, every day to acquire new customers, upsell our existing customers and aggressively convert our 36MCRB*.

112.    On March 12, 2019, the Individual Defendants caused the Company to publish a

press release announcing the Company's results for the fourth quarter of 2018 and for the fiscal

year 2018, both of which concluded on December 31, 2018.  The press release stated, in part:

*Q4 Revenue Growth of 256% and FY 139% Q4 Adjusted EBITDA of $2.34M and FY $6.4M*
*Q4 Non-GAAP EPS of $0.02 cents and FY $0.09 cents Net Dollar-Based Expansion Rate of 214% Year-Over-Year*
*Announces 2019 Guidance – Projecting 225-260% Year-Over-Year Revenue Growth*

*     *     *

## FOURTH QUARTER 2018 FINANCIAL RESULTS:

**(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)**

- Total revenues increased 256% to $14.3 million

- In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%

- Adjusted EBITDA increased 82% to $2.34 million

- Non-GAAP EPS of $0.02 cents

- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results

## FULL YEAR 2018 FINANCIAL RESULTS:

**(Unless otherwise noted, all comparisons are made to full year of 2017)**

- Revenues increased 139% to $32.4 million

- Adjusted EBITDA improved 199% year-over-year to $6.4 million

- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017

- We ended the year with a $6.1 million cash balance and no secured debt

## KEY 2018 OPERATIONAL METRICS:

- 36-month Contractual Revenue Backlog quadrupled to $615 million for the full year 2018, up from $147 million in 2017 with a conversion rate to revenue of 100%

- Connections increased 252% to 4,609,000 for the full year 2018, and grew 59% sequentially in the fourth quarter of 2018

●  Fourth quarter average annualized revenue per employee of $415,000,  an improvement of 78% year-over-year

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Q4 2017 | | Q1 2018 | | Q2 2018 | | Q3 2018 | | Q4 2018 | |
| REVENUE | 4,015 | | 4,113 | | 6,003 | | 8,008 | | 14,312 | |
| YEAR-OVER-YEAR REVENUE GROWTH | 870 | 28% | 1,318 | 47% | 2,764 | 85% | 4,509 | 129% | 10,297 | 256% |
| GROSS MARGIN | 2,910 | 73% | 2,918 | 71% | 4,223 | 70% | 5,879 | 73% | 9,085 | 63% |
| ADJUSTED EBITDA | 1,283 | | 283 | | 1,297 | | 1,782 | | 2,339 | |
| EBITDA | (2,733) | | (869) | | 597 | | (5,851) | | (3,093) | |
| CASH BALANCE | 13,538 | | 15,759 | | 19,205 | | 18,865 | | 6,052 | |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 147,000 | | 200,000 | | 276,000 | | 403,000 | | 615,000 | |
| CONNECTIONS | 1,310 | | 2,220 | | 2,714 | | 2,903 | | 4,609 | |

(italics and bolding in original).

113.  This press release again quoted defendant Turner as follows:

*2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth* driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers.  *In fourth quarter of 2018, we reported 256% year-over-year revenue growth*, which included the first full quarter of our accretive Artilium acquisition.  *We are extremely pleased with Pareteum's significant results in 2018 which are attributed to our TEUM's laser focus on sales expansion and operational improvements.  Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum given the strong industry dynamics; our visibility into future revenue from our 36 Month Contractual Revenue Backlog; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions.*

114.  The Individual Defendants also reported under the heading "RECENT BUSINESS HIGHLIGHTS" that an "initial draw" of $25 million of the $50 million Credit Facility would be used as follows:

●  The Company closed a $50M credit facility with Post Road Group in February 2019.  An initial draw of $25M will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions.

115.    Regarding the Company's 2019 Full Year Guidance, the March 12, 2019 press

release forecast *growth in the range of 225 – 260% year-over-year*:

> *We expect revenue to be between $105 million and $115 million for the full year of 2019*.  Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.
>
> *We are expecting 2019 revenue growth in the range of 225% to 260% year-over-year, outpacing the market growth rate fivefold to be updated quarterly*.

116.    On March 12, 2019, the Individual Defendants also hosted an earnings call with

analysts and investors during which they reiterated many of the same materially false and

misleading statements that had been made previously in press releases and SEC filings.

Defendant Turner also used this opportunity to further bolster expectations:

> *Pareteum delivered excellent results in 2018 as well as in the fourth quarter of 2018.  Pareteum's prospects are now the very best, more than ever before in our history.  There is a clear path ahead for dramatic revenue growth and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog into billing customers*.  Artilium, which we acquired in October of 2018, has performed extraordinarily well.  Bart, I want to thank you and all of our new Artilium teammates for that.  Artilium was accretive to earnings and revenue just as we said that it would be.  Well done, Bart and team.
>
> Since our acquisition of iPass closed just a few weeks ago, many good things have happened.  We've got newly -- new high experienced teammates joining with their extremely solid business acumen, their operating muscle, and importantly, we see that our new teammates are highly energized by the significantly expanded prospects that come with their being part of Pareteum.
>
> \*        \*        \*
>
> For the remainder of 2019, we have a current robust pipeline of another 29 prospective sales transactions, and that's what's been identified just through mid-March.  *Pareteum's potential addition to our 36-month contractual revenue from these identified customers in our pipeline is currently $166 million*.

117.    During the same March 12, 2019, earnings call, defendant McCarthy (identified

in the transcript as Pareteum President), also stated, in pertinent part:

> We generated $14.3 million of revenue in the fourth quarter and our gross margins
> were 63%, in line with expectations post the Artilium acquisition.
>
> *        *        *
>
> *Our key performance indicators continue to exceed plans.  Connections, which is
> our term for subscribers, devices and their connectivity usage, have grown over
> 4- point -- to over 4.6 million at the end of the fourth quarter.  36 Month
> Contractual Revenue Backlog converted into live production incremental monthly
> revenue was at 97% of scheduled conversion for the fourth quarter while we're
> maintaining an average over 100% for the year.*
>
> *        *        *
>
> Finally, as we mentioned during our last call, *we are decidedly a growth company*.
> . . .

118.    The statements made by the Individual Defendants in ¶¶ 105-113 above were each

materially false and misleading when made, and were known by the Individual Defendants to be

false at that time or were recklessly disregarded as such thereby, for the same reasons stated in ¶

¶ 79 *supra*, and detailed in ¶¶ 151-176 *infra*.

119.    On March 15, 2019, Pareteum, at the direction of the Individual Defendants,

issued another press release announcing more new contracts.  The press release stated that the

Company had acquired 10 new customers amounting to $17 million in the first half of March.

This press release again quoted defendants Turner and Mumby:

> Chief Revenue Officer Rob Mumby added, "We are seeing a fantastic response to
> our enhanced and expanded offering across all sectors.  I am confident we will
> continue to gain traction with our market-leading cloud services as we move
> towards the next quarter."
>
> [Defendant] Turner, commented, "These new customer wins reflect our deep
> understanding of the challenges faced by a diverse range of dynamic, market-

leading organizations, and the great response our solutions represent to those challenges. *Our momentum continues to grow in the wake of our acquisitions of Artilium and iPass, and our One TEUM strategy is delivering rich rewards*."

120. On March 28, 2019, the Individual Defendants announced another new contract, this time announcing a purported $50 million Global Expansion Contract with Streaming Media Brand. This press release stated, in part, that "[t]he initial phase of the contract is valued in excess of $50 million, which is incremental to Pareteum's 36-month contractual revenue backlog."

121. The March 28, 2019, press release again quoted defendants Bozzo and Turner:

"This is a showcase significant strategic win for Pareteum which further proves the value of our recent acquisitions in driving cross- and up-sell opportunities within our addressable markets and rapidly growing customer base," said [Defendant] Bozzo. . . .

[Defendant Turner] commented, "This latest partnership provides another great example of how Pareteum empowers brands to interact with customers to deliver targeted, locally relevant services and experiences, on a global basis. With our Global Smart Network, and Global Software Experience Platform, our brand partners can provide rich digital services from anywhere, to anywhere. Geographical boundaries no longer matter."

122. On March 18, 2019, Pareteum filed its 2018 year-end report on a Form 10-K, for the year ended December 31, 2018, with the SEC ("2018 Form 10-K"). This 2018 Form 10-K was certified by defendants Turner and O'Donnell pursuant to SOX, and signed by defendants Turner, Bozzo and O'Donnell, and prepared with the assistance of defendant McCarthy.

123. The 2018 Form 10-K, in Item 9A, entitled "Controls and Procedures" revealed that the Company's disclosure controls and procedures were not effective as of December 31, 2018. The 2018 Form 10-K states, in relevant part, the following:

(a)     Disclosure Controls and Procedures.

. . . Our management, with the participation of our principal executive officer and chief financial officer (our principal financial officer), has evaluated the

effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 131-15(e) and 15d-15(e)) as of December 31, 2018. Based on that evaluation, *our management concluded that because of material weaknesses in its internal control over financial reporting, as further described below, our disclosure controls and procedures were not effective as of December 31, 2018.*

(b)     Management's Annual Report on Internal Control over Financial Reporting.

*          *          *

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018 and in making this assessment used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework) in accordance with the standards of the Public Company Accounting Oversight Board (United States). Based on the foregoing evaluation, *our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting*:

*Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.*

*Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.*

124.    According to the Individual Defendants, however, these material weaknesses did not  result in any identified misstatements to the Company's financial statements and required no changes to the Company's previously released financial results.

125.    The Company's purported independent registered public accounting firm, Squar Milner LLP ("Squar Milner"), expressed an opinion for the audit of Pareteum's consolidated financial statements as of and for the year ended December 31, 2018, and issued the following adverse audit report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2018:

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Pareteum Corporation

**Opinion on the Internal Control Over Financial Reporting**

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013.  In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

\*       \*       \*

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.  The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019**.**

**Basis for Opinion**

\*       \*       \*

We conducted our audit in accordance with the standards of the PCAOB.

We believe that our audit provides a reasonable basis for our opinion.

\*       \*       \*

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> \s\ Squar Milner LLP
> Los Angeles, California
> March 18, 2019

(bolding in original).

126. Even though the Individual Defendants had admitted to the above material weaknesses, the 2018 Form 10-K also reported that there had been no changes in internal control over financial reporting:

> There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

127. However, the 2018 Form 10-K also stated that Pareteum's management was implementing and continued to implement measures designed to assure remediation of the control deficiencies contributing to the identified material weaknesses:

> The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting. This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.
>
>        *     *     *
>
> We believe that these actions will remediate the material weakness. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing,

> that these controls are operating effectively.  We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

128.    The statements made by Individual Defendants and contained in ¶¶ 115-123 above, were each materially false and misleading when made, and were known by the Individual Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated in ¶¶ 151-176 *infra*.

129.    The Individual Defendants were very careful to ensure that the almost 10 full pages of purported "Risk Factors" contained in the 2018 Form 10-K did little to nothing to alert investors to the additional problems the Company's lack of sufficient controls and  procedures was causing Pareteum, including the impact on the Company's ability to secure necessary agreements to enable Pareteum to utilize half of its $50 million Credit Facility, or the true financial and operational condition of certain new customers.

130.    In reality, the Risk Factors contained in the 2018 Form 10-K were completely ineffective and merely designed to conceal the material risks of investing in Pareteum.  These purported Risk Factors were either: (i)  generic statements that would apply to any company; (ii) purposefully inadequate statements meant to conceal the actual material adverse conditions then impacting Pareteum; or (iii) purposeful omissions, such as the risks involved in investing in a company with inadequate controls and procedures.

131.    Examples of the "generic" disclosures provided by the Individual Defendants within the 2018 Form 10-K that could apply to almost any business are as follows:

> The current economic climate, especially in Europe, may have an adverse effect in the markets in which we operate.
>
> Uncertainties and risks associated with international markets could adversely impact our international operations.

We operate in a complex regulatory environment, and failure to comply with applicable laws and regulations could adversely affect our business.

We may not be able to integrate new technologies and provide new services in a cost-efficient manner.

We may not be able to develop and successfully market our mobile telecommunications platform and services as planned.

Implementation and development of our software platform business depends on our ability to obtain adequate funding.

Disruptions in our networks and infrastructure may result in customer dissatisfaction, customer loss or both, which could materially and adversely affect our reputation and business.

Integration of acquisitions ultimately may not provide the benefits originally anticipated by management and may distract the attention of our personnel from the operation of our business.

Our revenue, earnings and profitability are affected by the length of our sales cycle, and a longer sales cycle could adversely affect our results of operations and financial condition.

Because most of our business is conducted outside the U.S., fluctuations in foreign currency exchange rates versus the U.S. Dollar could adversely affect our results of operations.

We are substantially smaller than our major competitors, whose marketing and pricing decisions, and relative size advantage, could adversely affect our ability to attract and retain customers and are likely to continue to cause significant pricing pressures that could adversely affect our net revenues, results of operations and financial condition.

Our positioning in the marketplace as a smaller provider places a significant strain on our resources, and if not managed effectively, could result in operational inefficiencies and other difficulties.

132.    Examples of the second type of ineffective and inadequate Risk Factors meant to

conceal then current material adverse conditions impacting the Company as mere contingencies

which may or may not impact Pareteum, were evidenced in the last purported business specific

Risk Factor stated in the 2018 Form 10-K, regarding the Post Road Group Credit Facility:

> We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.
>
> In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents"). The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including:  requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees.  The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver Consents by May 31, 2019 or July 31, 2019, as applicable.  There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations.

133.    In addition to being false and materially misleading, this purported Risk Factor

failed to report that, at that time, the Company had already failed to make timely payments under

the Credit Facility, the Individual Defendants were unable to obtain the signatures necessary to

obtain the second 50% of the Credit Facility amount, and they were also in technical breach of the

Credit Facility Covenants by failing to provide timely interim financial reports to the lender.

134.    The Company's other Risk Factors contained in the 2018 Form 10-K, relating to

Pareteum's industry participation and capital stock, were even more general and vague, lacking

any specific relation to the Company at the time:

> Changes in the regulation of the telecommunications industry could adversely affect our business, revenue or cash flow.

> The market for communications services is highly competitive and fragmented, and we expect competition to continue to increase.

> The telecommunications industry is rapidly changing, and if we are not able to adjust our strategy and resources effectively in the future to meet changing market conditions, we may not be able to compete effectively.

> If we are not able to operate a cost-effective network, we may not be able to grow our business successfully.

> We could issue additional common stock, which might dilute the book value of our capital stock.

> Shares eligible for future sale may adversely affect the market for our common stock.

> We have no dividend history and have no intention to pay dividends in the foreseeable future.

135.    The 2018 Form 10-K also contained certifications, signed by defendants Turner

and O'Donnell, pursuant to SOX, that attested to the accuracy and completeness of Pareteum's

financial and operational reports.  These certifications were the same, and/or were substantially

similar to the certifications filed in connection with Pareteum's 2019 first quarter Form 10-Q,

reproduced herein in ¶¶ 143-144 *infra*, and were materially false and misleading and were known

by the Individual Defendants to be false at that time, or were recklessly disregarded as such

thereby, for the reasons stated herein, in ¶¶ 151-176 *infra.*

136.    On April 4, 2019, Pareteum, at the direction of the Individual Defendants, issued

another press release, titled "Pareteum Achieves $100 Million in New Sales Agreements During

March." Defendant Turner and Chief Revenue Officer Mumby again used the press release to

peddle the Individual Defendants' illusory story of Pareteum's hyper-growth to the marketplace:

> [Defendant] Turner, commented, "*We have developed, built, and delivered
> software services for a wide range of customers and we are rapidly moving into
> new markets and territories with 'communications reimagined' services. This
> record performance, our very first $100 million new 36MCRB sales month, reflects
> the strong value customers derive as they continue to buy our services*. All
> Pareteum TEUMATES have had a hand in the performance and I congratulate each
> of our colleagues."
>
> Pareteum's Chief Revenue Officer, Rob Mumby, added, "*We continue to win great
> new customers while positioning ourselves to become increasingly strategic to
> existing customers with our highly flexible cloud communications services*."

137.    On May 7, 2019, the Individual Defendants published a press release announcing

purported results for the first quarter of 2019, for the period ended March 31, 2019. This press

release stated, in pertinent part, the following:

*Pareteum Announces First Quarter 2019 Financial Results*
*Q1 Revenue of $23 Million Drives Growth of 460% Year-over-Year*
*Q1 Adjusted EBITDA of $5.2 Million*
*Net Dollar-Based Expansion Rate of 144% Year-over-Year*
*Increases Full Year 2019 Guidance – Projecting 255-285% Year-over-Year*
*Revenue Growth*

\*      \*      \*

## FIRST QUARTER 2019 FINANCIAL RESULTS:

**(Unless otherwise noted, all comparisons are made to the first quarter of
2018)**

- Total revenues increased 460% to $23 million Adjusted EBITDA
  increased 1,723% to $5.2 million
- Non-GAAP EPS of $0.02 cents

- Artilium and iPass financials are consolidated and accretive in Pareteum's first quarter results
- Net Dollar-based expansion rate represented 144% growth
- Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019
- Cash balance of $10.7 million

## KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:

- 36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%
- Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019
- First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 2019 | | Q4 2018 | | Q3 2018 | | Q2 2018 | | Q1 2018 |
| REVENUE | 23,040 | | 14,312 | | 8,008 | | 6,003 | | 4,113 |
| YEAR-OVER-YEAR REVENUE GROWTH | 18,927 | 460% | 10,297 | 256% | 4,509 | 129% | 2,764 | 85% | 1,318 | 47% |
| GROSS MARGIN | 12,972 | 56% | 9,085 | 63% | 5,879 | 73% | 4,223 | 70% | 2,918 | 71% |
| ADJUSTED EBITDA | 5,156 | | 2,339 | | 1,782 | | 1,297 | | 283 |
| EBITDA | (2,485) | | (3,093) | | (5,851) | | 597 | | (669) |
| CASH BALANCE | 10,699 | | 6,052 | | 18,865 | | 19,205 | | 15,759 |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 938,000 | | 615,000 | | 403,000 | | 276,000 | | 200,000 |
| CONNECTIONS | 12,012 | | 4,609 | | 2,903 | | 2,714 | | 2,220 |

(bolded and italicized headings in original).

138.    The May 7, 2019 press release also quoted defendant Turner, in pertinent part, as follows:

"*We are very pleased with our strong first quarter results, delivering 460% revenue growth in Q1 2019 compared to Q1 2018*. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter," commented [defendant] Turner. "We are proud of the significant business transformation we have achieved over the past few years. *Pareteum is a fast-growing and profitable SaaS and communications service provider. Our software and platform solutions are unique in the market, our global TEUM is executing, we are well positioned to*

*capture the large market opportunity*, and we are committed to our mission to connect every person and every(thing)™."

139.    Regarding the Company's purported 2019 first quarter "RECENT BUSINESS HIGHLIGHTS," the Individual Defendants again reported on the $50 million Credit Facility obtained in February 2019, as follows:

- The Company closed a $50 million credit facility with Post Road Group in February 2019.  An initial draw of $25 million will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions

140.    The May 7, 2019 press release also provided an updated "2019 FULL YEAR GUIDANCE," which again raised purported growth expectations – now as high as  285% year-over-year – as follows:

We expect revenue to be between $115 million and $125 million for the full year of 2019.  Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

*We are expecting 2019 revenue growth in the range of 255% to 285% year-over-year, outpacing the market growth rate fivefold to be updated quarterly*.

141.    Later the same day, the Individual Defendants hosted an earnings call with analysts and investors during which they reiterated many of the same materially false and misleading statements as they had made previously in press releases and SEC filings.  In addition, defendant Turner once again used this opportunity to peddle the Company's remarkable performance and growth story:

"Now to our business at hand.  *Pareteum is performing extremely well.  Without taking too much of Denis's thunder from his results review coming shortly.  We reported a 460% Q1 2019 over Q1 2018 revenue increase*, more from Denis on that shortly.  However we are on target with our products delivered, those being developed, our markets served and those that we will expand to.  Our customers who are onboarding now even more efficiently and our people, matching the very

best resources to address every opportunity we have. *In every sense, this Company has reimagined the future of communications and we're delivering on it today*.

Our mission of connecting every person and everything is also on track. *We're on plan financially and we're well above our expectations and sales results*. We're raising the quality of customer experiences everyday and *we're raising our results and performance expectations with operational transparency. As a growth Company, we're expanding in a financially responsible manner*."

142.    Regarding the Company's purported Backlog, defendant Turner also stated during

the May 7 earnings call, in pertinent part, the following:

"To complete the 36-month contract revenue backlog topic, the most important phase for Pareteum is to convert these contracts to billable revenues. This means new sales orders placed into live production, based upon their contracted schedules for service, invoices rendered, being billed and revenues collected. Our backlog conversion metrics show this story and we're doing very well in this regard.

I'd like to share a couple of details with you. *From the inception of tracking the services deployed during the period of January the 1st, 2017 through March the 31st of 2019, that's a 27-month period, we converted revenues in the backlog as they were scheduled at 101%. We converted connections which is our word for subscribers at 122%. This means that taking each contract and comparing what was contractually scheduled by the customers. In both the revenue and connections, we we've over retained and outperformed what had been expected. We're very pleased with this growth performance*. But I must tell you we're even more pleased with what I'm about to say to you."

143.    During the May 7, 2019, earnings call, defendant McCarthy also stated, in

pertinent part, the following:

"We have achieved organic growth of 32% over the prior-quarter from the combined Pareteum and our Artilium business . . .

*        *        *

As discussed on our year-end call, we established a new $50 million credit facility with Post Road Group and retired the more expensive debts acquired in the iPass acquisition. The facility also provides us with significant available liquidity going forward should we need it.

While we currently have no plans for the additional capital to operate our business, it gives us additional security and flexibility.  I want to reinforce Hal's comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation, we have experienced some challenges including those related to our internal controls, primarily as a result of M&A integration."

144.    The statements made by the Individual Defendants and contained in  ¶¶ 127-139 above were each materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein in ¶¶ 151-176 *infra*.

145.    With the true adverse conditions still unknown to shareholders at that time, shares of the Company rallied on this positive news.   As evidence of this, Pareteum common stock traded to just below $5.40 per share on May 7, 2019, on significant volume of almost 7.9 million shares, demonstrating a significant increase over the prior day's closing price of $5.18 per share.  During the two-day period between May 7 and May 8, 2019, over 16 million of the Company's shares traded - many times the average daily trading volume, as Pareteum shares traded well-above $5.00 per share.

146.    As shares of Pareteum continued to trade at artificially inflated levels, on May 10, 2019, the Individual Defendants caused the Company to file with the SEC the Company's 2019 first quarter Form 10-Q, for the quarter ended March 31, 2019 (hereinafter "1Q:19 Form 10-Q"). The 1Q:19 Form 10-Q was signed and certified by defendants Turner and O'Donnell.   In addition to making substantially similar materially false and misleading statements concerning Pareteum's operations and customer growth as had been published previously, the 1Q:19 Form 10-Q also purported to report the Company's significant accounting policies and the basis of its accounting presentation as follows:

**Basis of Presentation of Interim Periods**

*The interim condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP,") for interim financial information and in accordance with the instructions to Securities and Exchange Commission ("SEC"), Form 10-Q and Article 8 of SEC Regulation SX.* They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2018, included in our 2018 Annual Report on Form 10K filed with the SEC on March 18, 2019, referred to as our 2018 Annual Report.

*The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods.* The results of operations for the three months ended March 31, 2019, are not necessarily indicative of the results to be expected for future quarters or the full year. All intercompany transactions and account balances have been eliminated in consolidation. . . .

147.    In addition to the foregoing, the certifications of defendants Turner and O'Donnell attested to the accuracy and completeness of Pareteum's financial and operational results, as follows:

**CERTIFICATION**

Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 I, [Defendant Turner or O'Donnell], certify that:

1)    I have reviewed this quarterly report on Form 10-Q of Pareteum Corporation.;

2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of a quarterly report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

> > reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

| | |
|---|---|
| Dated: May 10, 2019 | Dated: May 10, 2019 |
| /s/ Robert H. Turner | /s/ Edward O'Donnell |
| Robert H. Turner | Edward O'Donnell |
| Executive Chairman | Chief Financial Officer |
| Principal Executive Officer | Principal Financial and Accounting Officer |

148.    Similarly, the Company's 1Q:19 Form 10-Q contained certifications, pursuant to

SOX, by defendants Turner and O'Donnell, that attested to the Company's compliance with the

requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and that the

Company's 1Q:19 Form 10-Q fairly presented the financial condition and results of operations

of Pareteum:

## CERTIFICATION

### Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002(18 U.S.C. 1350)

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350), the undersigned officer of Pareteum Corporation, a Delaware corporation (the "Company"), does hereby certify, to the best of such officer's knowledge and belief, that to my knowledge:

1)    The Quarterly Report on Form 10-Q for the quarter ended March 31, 2019 (the "Form 10-Q") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2)    The information contained in the Form 10-Q fairly presents, in all materials respects, the financial condition and results of operations of the Company.

| | |
|---|---|
| Dated: May 10, 2019 | Dated: May 10, 2019 |
| /s/ Edward O'Donnell | /s/ Robert H. Turner |
| Edward O'Donnell | Robert H. Turner |
| Chief Financial Officer | Executive Chairman |
| Principal Financial and Accounting Officer | Principal Executive Officer |

149.    The Company's 1Q:19 Form 10-Q also contained statements that continued to

attest to the Controls and Procedures that persisted at Pareteum throughout the first quarter of

2019, for the period ended March 31, 2019, as follows:

**Item 4. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

As of March 31, 2019, the Company carried out an evaluation, under the
supervision and with the participation of the Company's management, including
the Company's Principal Executive Officer and Principal Financial and Accounting
Officer, of the effectiveness of the design and operation of the Company's
disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of
the Securities Exchange Act of 1934. Based on the evaluation, the Company's
Principal Executive Officer and Principal Accounting Officer have concluded that,
*due a previously reported material weakness in our internal control over financial
reporting described below, the Company's disclosure controls and procedures
were not effective as March 31, 2019. In light of the material weakness described
below, we performed additional analysis and other post-closing procedures to
ensure our financial statements are prepared in accordance with generally
accepted accounting principles.*

150.    In addition to the foregoing assurances, the Individual Defendants also reported

that substantial remediation had already occurred and that the material weakness had been

"remediated . . . pending further testing:"

We also continue to develop certain remediation steps to address the material
weakness discussed above to improve our assessment of internal control over
financial reporting. As of March 31, 2019, these efforts are ongoing.

We are committed to maintaining a strong internal control environment and believe
that these remediation actions will represent significant improvements in our
controls. However, the identified material weakness in internal control over
financial reporting will not be considered remediated until controls have been
designed and/or controls are in operation for a sufficient period of time for our
management to conclude that the material weaknesses have been remediated.
Additional remediation measures may be required, which may require additional
implementation time. We will continue to assess the effectiveness of our

remediation efforts in connection with our evaluations of internal control over financial reporting.

151.    The 1Q:19 Form 10-Q did nothing to update or augment the Risk Factors previously provided in Pareteum's 2018 Form 10-K filed on March 18, 2019 (*see* ¶¶ 105-110 *infra*).  Instead, the 1Q:19 Form 10-Q "Item 1A. Risk Factors" simply referred investors back to the 2018 Form 10-K:

> In addition to the other information set forth in this Quarterly Report on Form 10Q, you should carefully consider the Risk Factors included in Part I, Item 1A.  "Risk Factors" of our Annual Report on Form 10K for the year ended December 31, 2018, and the Risk Factors included in Part I, Item 1A. – "Risk Factors" of our Quarterly Report on Form 10Q for the period ended September 30, 2018.  These Risk Factors could materially impact our business, financial condition and/or operating results. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely impact our business, financial condition and/or operating results.

152.    The statements made by the Individual Defendants and contained in ¶¶ 142-147 above were each materially false and misleading when made, and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated in ¶ 79 *supra* and further detailed in ¶¶ 151-176 *infra*.

153.    On May 15, 2019, the Individual Defendants again caused the Company to publish a press release that announced $70 million in New Sales Agreements in April in connection with the closing of at least 20 new sales transactions.  This press release again quoted defendant Turner and Chief Revenue Officer Mumby:

> "We continue to drive growth through our sales efforts as our addressable markets expand and our cloud-based SaaS products and solutions are able to deliver new requirements in an increasingly connected world," said [Defendant] Turner "At Pareteum, we believe we are 'all in sales' and we are pleased with another strong monthly performance."

> "Each new customer represents an opportunity to build a unique and strategic relationship and facilitates cross-sell and up-sell of our expanding suite of global cloud software capabilities," added Rob Mumby. . . .

154.    The statements made by the Individual Defendants and contained in ¶ 150 above were each materially false and misleading when made and were known by the Individual Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein in ¶¶ 151-176 *infra*.

## D.  The Truth is Revealed

155.    On June 7, 2019, the Marcus Aurelius Value Report was published.  The Marcus Aurelius Value Report revealed, for the first time, that:  (i) the Individual Defendants were engaged in a fraudulent scheme to inflate revenues and the Company's Backlog, by fabricating clients and/or claiming that certain clients have the ability to generate tens of millions of dollars in revenue when they do not; (ii) the Individual Defendants had failed to disclose material facts about Company's officers, board members, significant investors and senior staff; and (iii) that the Company was "completely uninvestible" and subject to "massive downside potential[.]"

156.    The Marcus Aurelius Value Report, entitled *TEUM:  Where Are The Customers?* stated, in part, the following:

> TEUM's public claims simply don't hold up to investigative scrutiny.  For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth $50 million in aggregate, that TEUM says it signed in the last two weeks of August 2018.  Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village . . .

> Documents and detailed forensic evidence presented throughout this report shows that Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with.

157.    The Marcus Aurelius Value Report also stated that "[Pareteum's] Purported $900

Million Backlog Appears Significantly Exaggerated or Fictitious":

> The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million.  But our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted.  Examples include:

- A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.
- African entities that show no signs of meaningful business activity.
- Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors."
- Closed or dissolved businesses.
- Websites that are inactive or offer limited contact information.
- Businesses that don't answer the phones or report having minimal employees.
- European entities with tiny amounts of capital or revenue.
- Featured customers located in apartment buildings.
- Millions in loans to an entity bleeding cash.
- A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.

> We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

158.    The Marcus Aurelius Value Report further concluded that "[Pareteum's] Backlog

Conversion and Receivables Signal Serious Potential Accounting Problems" and stated in

pertinent part, the following:

> The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price. Bulls have taken comfort in management's assurances that TEUM's backlog has converted to revenue at over 100% of contractual rates thus far.  But we find TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers.  If exaggerated

contractual values are now being recognized as revenue, then we believe TEUM will face serious accounting problems.  TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters.  TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

*       *       *

The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the company's stock price.  Is it possible that this exact kind of scheme is now occurring at TEUM?

Bulls have taken comfort in management's assurances that backlog has converted to revenue at over 100% of contractual rates thus far.  Backlog turning into actual revenue, the thinking seems to go, is a sign that TEUM's new contract wins must be high quality in nature.  Conversely, we find TEUM's backlog conversion rate highly problematic considering that our research has flagged customers that are small, defunct, or seem unlikely to be able to pay TEUM anywhere near the large contractual values that TEUM has touted.  If these kinds of exaggerated contracts are now being recognized as revenue, as management's commentary indicates, then we believe TEUM will face serious accounting problems.

This is exactly why we're troubled that TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters.  For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period.  This is puzzling because TEUM's own SEC filings state that "the company typically bills its customers at the end of each month, with payment to be received shortly thereafter", which we believe should naturally result in relatively minimal receivables.  But TEUM's Days Sales Outstanding has reached 110 days as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

TEUM's small California auditor, Squar Milner, gives us no additional comfort.  Squar has audited at least one company owned by Barry Honig, True Drinks Holdings (TRUU), an equity that is now virtually worthless.  More importantly, the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017.  The PCAOB stated in its report that "in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement."  The

PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue . . .

159.    The Marcus Aurelius Value Report also disclosed that Pareteum's management and executive teams have ties to previous alleged frauds and failures:

TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions

We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills.  TEUM has paid promoters, used a placement agent, and attracted large investors that are veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness.  We discovered that TEUM's relationship with Honig's longtime securities law firm, Sichenzia Ross, is so close that the address that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office.  TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding….

\*       \*       \*

TEUM's Management Team Has Extensive Ties to Previous Alleged Frauds and Failures

TEUM's biographies of Turner and Chief Operating Officer, Denis McCarthy, fail to disclose their respective roles as CEO and CFO of Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, who was charged by the SEC last October with fraud for allegedly masterminding a series of pump and dump schemes.  On May 22nd, CNBC reported there is a parallel criminal investigation into Honig's alleged pump and dump ring being conducted by the U.S. Attorney's Office of San Francisco.

\*       \*       \*

We also learned that TEUM's CFO, Edward "Ted" O'Donnell, was sued by AudioEye investors for fraud after he allegedly "personally affected the fraudulent booking of revenues" that triggered a restatement erasing 92% of the company's reported revenue over the relevant period.  The lawsuit alleged that the fraud was designed to "give the market the false notion that revenue growth was accelerating" and "artificially inflate AudioEye's stock price" (O'Donnell denied the allegations

and the lawsuit appears to have been settled).  O'Donnell resigned from AudioEye in March 2015 and joined TEUM in January 2017.

*     *     *

While Chairing TEUM's Audit Committee, Laura Thomas was also the CFO of TowerStream, a nearly worthless equity owned by Honig.  Thomas moved from the TEUM Board to an executive role at TEUM in December 2018 and resigned from TowerStream in January 2018.

TEUM's longtime investor relations representative was Stephan Hart (aka Steven or Stephen Hart) who disappeared from TEUM press releases earlier this year after being added to the list of prohibited service providers by OTC markets.  Hart was representing TEUM even though he was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "illegal trading schemes" in December 2012.[9]

160.    The Marcus Aurelius Value Report also stated that Pareteum had surrounded itself with many veterans from failed stock promotions as detailed in the following:

While Honig is not named as a TEUM investor, we uncovered a series of relationships that make it hard for us to rule out the possibility that his invisible hand could be at work.  At absolute minimum, it's clear to us that TEUM is backed by a seasoned crowd of veterans from dubious stock promotions:

- TEUM is represented by Sichenzia Ross, the securities law firm of record for at least 22 companies that Honig and/or John Stetson, an alleged member of the pump and dump ring, have invested in since 2009. Bizarrely, the relationship between TEUM and Sichenzia is so close that the address TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's Main Office.  A 2017 Sichenzia press release states that Sichenzia has a long-term lease for the entire 37th floor that Pareteum currently lists as its address.

*     *     *

---

[9]  Stephen Hart ("Hart") appeared as the investor relations contact on Pareteum's press releases, at least until March 5, 2019.  Hart is identified as a representative of an entity identified as Hayden IR, with what appears to be a 917 area code contact number (area code 917 is a cell exchange in the New York city metro area).

- TEUM uses the same placement agent as Mabvax [Theraputics][10] did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM.  According to our analysis, Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.

- While we are unable to identify all of TEUM's private placement investors, two firms that have regularly invested alongside Honig, Iroquois Capital and IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018, according to an SEC filing.  By our count, Iroquois and/or Intracoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless.  A February 2019 SEC filing reported that Iroquois Capital has already dumped their entire TEUM stake. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.

- TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. . . .

161.    Based on the foregoing, the Marcus Aurelius Value Report concluded that, "**[j]ust in isolation, we believe the mere presence of this collection of actors should send diligent investors running for hills**" and "**[i]n our opinion TEUM's stock is completely uninvestible . . . [with] massive downside potential**," (emphasis in original).

162.    These June 7, 2019 revelations revealed that the Individual Defendants had materially misrepresented Pareteum's financial and operational condition, the true value of its Backlog, the connections between management and prior failed dubious stock promotion schemes, and the Company's results of operations.  These revelations caused the shares of the

---

[10]  The Aurelius Report identifies Mabvax Theraputics as a "worthless penny stock that the SEC says was the scene of a Honig-led pump and dump[.]"

Company to collapse almost 45%, from a close of about $3.50 per share on June 6, 2019, to an intra-day low of just over $2.00 per share -- on very high single-day trading volume of over 26 million shares traded.

163.    On June 26, 2019, the Viceroy Report was also exposing Pareteum entitled "*The Wild West of Telecoms*."  The Viceroy report substantially agreed with the findings of the Marcus Aurelius Value Report, and further revealed the following:

Pareteum – The Wild West of Telecoms[11]

June 25, 2019 – Pareteum (NASDAQ:TEUM) provides services to Mobile Virtual Network Operators (MVNOs), who sell data/minutes to users and purchase data/minutes from telecom network operators.  Recently Pareteum has been subject to criticism from other short sellers.  Given the discourse, Viceroy believe it is prudent that we also share our findings.

- Further to recent research reports, Pareteum has a history of promotional press releases of customer wins.  A deeper investigation into these customers show a much larger number are insignificant, and the companies behind them appear in no way capable of fulfilling the contract values advertised by Pareteum.

- Two of Pareteum's customer wins appear to be undisclosed related parties tied to Pareteum consultant Dinesh "Danny" Patel.

- One of Pareteum's announced customer wins is a company under a historic investigation and charged with significant VAT evasion fraud. Information on this is easily available, leading us to believe that Pareteum was aware of the company's issues while announcing the customer win.

\*          \*          \*

---

[11]   As one market analyst noted, "[s]hares of Pareteum lost 24% of value on June 7 after a short call by Aurelius Value.  To that, Viceroy says "Kudos to Aurelius Value for beating us to the punch. We identify further non-existent contracts, undisclosed related parties, and an apparent breach of Iran sanctions."  *See* Jason Aycock, *Pareteum -18.7% as Viceroy piles on short reporting*, SEEKING ALPHA (June 26, 2019, 3:01 PM), https://seekingalpha.com/news/3474049-pareteumminus-18_7-viceroy-piles-on-short-reporting.

- Several entities on the Pareteum cloud domain are small companies or have no web presence whatsoever, leading us to believe that they are Pareteum customers who are unable to pay or have no operations.

\*       \*       \*

- Pareteum's management has a history of dishonest reporting.  Notably, CFO Ted O'Donnell who was sued by former employer AudioEye for fabricating US$8.1m worth of revenue over 3 quarters which was found to have no supporting documentation.  This was an overstatement of revenues in the period of more than 3,000%.

- Pareteum's rapid-fire announcement of customer wins mirrors its announcements regarding cryptocurrency in 2017, which were put to an abrupt halt when a response to an SEC letter revealed TEUM had made no revenue, nor planned to do so, from cryptocurrency.

164.    Based on the foregoing inflation of the Company's foreseeable Backlog by the Individual Defendants, the Viceroy Report also concluded that a breakdown of Pareteum's revenues, cash flows and receivables show the majority of its revenue from sources other than Vodafone[12] and acquired businesses, iPass and Artilium, appear to be uncollectable. Accordingly, the Viceroy Report concluded that, "total revenue is overstated by 42%".

165.    The Viceroy Report also stated that "Pareteum's 36-month contractual [Backlog] measurement [was] not an accurate predictor of future profits" and, that "an analysis of the Company's Backlog and management comments demonstrates that Pareteum "should have reported 73.10% more revenue in Q1 2019[.]"  The conclusion reached by Viceroy was that "[m]anagement appears to be inflating this [Backlog] figure to hype up the share price  and reassure investors."

---

[12] The Viceroy Report notes that Vodafone Enabler S.L., an MVNO operating on Vodafone Spain's network, is Pareteum's "largest historical customer."

166.    The Viceroy Report went on to describe Pareteum's hyper-growth as "suspicious," stating in pertinent part:

> "After our investigation we believe this growth story is completely broken and may not have ever existed at all.  Investors should take a look at the damage inflicted on Catcher Holdings, Davnet and AudioEye as a sign of things to come if management is investigated or held accountable for its actions.

> We advise investors to call for a fully independent investigation of management, in particular:  Hal Turner and Ted O'Donnell and for an investigation of the Company's revenue recognition practices and internal controls."

167.    The publishing of the Reports caused the Individual Defendants to pre-announce Pareteum's results for the second quarter of 2019, the period ended June 30, 2019. On July 1, 2019, the Individual Defendants announced that Pareteum  would  "exceed current analysts' consensus of $26.2 million for revenue and $4.1 million for Adjusted EBITDA."

168.    However, as pointed out by a market commentator,[13] "the vague pre-announcement lacked important information required to reinforce investor confidence."  This commentator further noted that "[w]hile better than expected top and bottom line numbers are attractive, they are actually worth very little if accounts receivable have continued to balloon, further negatively impacting cash flows" as they had during the first quarter of 2019 when Pareteum reported adjusted EBITDA of $5.2 million on $23.0 million in revenues, but free cash flow was actually negative by $5.5 million even when adjusting for $2.7 million in additional loans to the ominous Yonder Mobile Media entity.[14]

---

[13]   Henrik Alex, *Pareteum's Q2 Upside Preannouncement Not Suited To Restore Investor Confidence*,   SEEKING   ALPHA   (July   3,   2019,   9:10   AM) https://seekingalpha.com/article/4273291-pareteums-q2-upside-preannouncement-    suited-restore-investor-confidence.

[14] *See* Viceroy Report *supra* at n.10 ("Pareteum has made an US$3.7m loan to Yonder Media

169.    In reaction to the Company's July 1, 2019, pre-announcement of second quarter results, the same market commentator stated, "[f]rankly speaking, Q2 cash flows should be improved meaningfully particularly given management's statements regarding the recent iPass acquisition on the Q1/2019 conference call."[15]

170.    On August 23, 2019, the Company unexpectedly filed with the SEC a "WAIVER AND FIRST AMENDEMENT TO CREDIT AGREEMENT," (hereinafter "WAIVER") related to Pareteum's Post Road Group Credit Facility in order to obtain a waiver of default and small amount of additional cash, as follows:

### WAIVER AND FIRST AMENDMENT TO CREDIT AGREEMENT

This WAIVER AND FIRST AMENDMENT TO CREDIT AGREEMENT dated as of August 22, 2019 (this "Amendment") is by and among PARETEUM CORPORATION, a Delaware corporation (the "Borrower"), the guarantors party hereto (the "Guarantors" and together with the Borrower, each a "Credit Party" and, collectively, the "Credit Parties"), the lenders party hereto (each a "Lender" and, collectively, the "Lenders"), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company ("Post Road"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent") and Post Road, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent"), and relates to that certain Credit Agreement dated as of February 26, 2019, by and among the Borrower, the Credit Parties party thereto, the Lenders party thereto and the Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

---

Mobile, an early stage MVNO operated by serial failure entrepreneur Adam Kidron.  Kidron has burned at least US$100m in his enterprises, having already cratered the Yonder brand with a music streaming service which collapsed in 2017.")

[15]    Henrik Alex *Pareteum's Q2 Upside Preannouncement Not Suited To Restore Investor Confidence*, SEEKING ALPHA (July 3, 2019, 9:10 AM) https://seekingalpha.com/article/ 4273291-pareteums-q2-upside-preannouncement-suited- restore-investor-confidence.

WHEREAS, the Borrower has requested that the Administrative Agent (a) waive the breaches of certain obligations and covenants under the Credit Agreement as set forth in greater detail on Annex A attached hereto for the periods specified therein, as applicable (collectively, the "Subject Obligations and Covenants") and (b) amend the Credit Agreement as set forth herein; and

WHEREAS, the Administrative Agent is willing to acquiesce to the Borrower's request, subject to the terms and conditions outlined in this Amendment.

171. Annex A to the WAIVER contained the following list of 11 breaches and

conditions unsatisfied under the Company's Post Road Group Credit Facility:

1. To comply with the requirements set forth in the definition of "Permitted Acquisition" in connection with the consummation of the DeviceScape Acquisition as required by clause (m) of Section 9.05 of the Credit Agreement.

2. To timely make the interest payment owed to the Administrative Agent for the Period that ended on or about March 31, 2019, as required by Section 2.09(b) of the Credit Agreement.

3. To timely deliver (i) the financial reporting information for the fiscal month ending February 28, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

4. To timely deliver (i) the financial reporting information for the fiscal month ending March 31, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

5. To timely deliver (i) the financial reporting information for the fiscal quarter ending March 31, 2019 as required by Section 8.01(b) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

6. To timely deliver (i) the financial reporting information for the fiscal month ending April 30, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

7. To timely deliver (i) the financial reporting information for the fiscal month ending May 31, 2019 as required by Section 8.01(a) of the Credit

Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

8.   To timely deliver (i) the financial reporting information for the fiscal month ending June 30, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

9.   To timely deliver the [***] Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

10.  To timely deliver the [***] Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

11.  To comply with Sections 8.10 and 8.11 of the Credit Agreement in connection with the formation of its wholly-owned subsidiary DeviceScape Holdings, Inc., a Delaware corporation, and its acquisition of certain assets from DeviceScape Software, Inc., a California corporation, on or about April 22, 2019.

172.   As a condition of obtaining $2.5 million in additional financing and the Waiver, Pareteum was forced to issue 750,000 additional shares of common stock to Post Road Group, thereby further diluting existing shareholders. Moreover, these belated disclosures also had an immediate negative impact on the price of Pareteum shares, causing the stock to fall from just under $3.00 per share on August 23, 2019, to just above $2.00 per share on the next trading day, August 26, 2019.

173.   The following day, August 27, 2019, a report was published on the *Seeking Alpha* investor information website, titled, "*Pareteum - Caught In A Cash Crunch After Violating Debt Covenants.*"[16] This report stated, in pertinent part:

---

[16]  Henrik Alex, *Pareteum – Caught In A Cash Crunch After Violating Debt Covenants*, SEEKING ALPHA (August 27, 2019, 7:34 AM), https://seekingalpha.com/article/4288112-pareteum-caught-cash-crunch-violating-debt-covenants.

Shares of controversial emerging Communications Platform as a Service ("CPaaS") provider Pareteum Corporation have remained under pressure in recent weeks after the company's Q2/2019 results on August 6 revealed two major issues:

- Accounts receivable ballooned an eye-catching 57% quarter-over-quarter, even outpacing the 48% sequential revenue increase. Over the past six months, accounts receivable have almost tripled from $15.4 million at year end 2018 to $45.1 million at the end of Q2.

- Free cash flow for the quarter was negative $8 million, leaving the company with just $3.4 million in unrestricted cash at the end of Q2, dangerously close to the $2 million minimum liquidity covenant defined in its up to $50 million senior secured credit facility with Post Road Group, a Connecticut- based junior private investment firm. For the first half of FY2019, Pareteum used $16.7 million in operating and investing activities.

On the conference call, management actually pointed to accounts receivable to increase even further during Q3 with collections starting to come through in Q4.

174.    The August 27, 2019, *Seeking Alpha* report also noted that as a result of its

impaired financial and operational condition, a highly dilutive secondary offering was going to

be required to enable Pareteum to raise money:

Personally, I do neither expect the company to return to covenant compliance in due time nor the accounts receivable issue starting to resolve itself by next quarter. Accordingly, investors might have to prepare for a large, secondary offering in the not too distant future.

Should the company not start to collect on its accounts receivable in due time, Pareteum will likely lose its ability to access the capital markets with bankruptcy being the ultimate outcome in this case.

Given the recent, negative developments and the company's increasingly uncertain outlook, investors should continue to avoid the shares or sell existing positions.

175.    The August 27, 2019, *Seeking Alpha* report further warned that:

At this point, the company might still be able to sell additional equity but given the requirement to raise at least $35-$40 million to repay the [C]redit [F]acility including considerable exit fees and bridge the gap to anticipated cash collections in Q4 would likely cause the stock to tumble well below the $2 mark, particularly

if investors require Pareteum to issue warrant sweeteners or even enter into a toxic financing transaction.

Frankly speaking, things are really starting to look ugly for Pareteum.  The company has been in breach of debt covenants basically right from the closing date of the credit agreement with Post Road Group in February and seems now caught in a severe cash crunch.

176.    The *Seeking Alpha* Report concluded that:

As of this point, it seems that the skeptics have been right on Pareteum as the company is obviously experiencing a cash crunch with the lender only reluctantly providing additional liquidity to keep the company afloat for now.

Should Pareteum again fail to comply with the covenants and obligations under the amended credit agreement, Post Road Group might very well choose to issue a notice of default, requiring the company to repay the almost $28 million currently outstanding under the facility within short notice.

177.    On September 20, 2019, Pareteum published a press release announcing a dilutive $40 million offering of common stock and warrants that immediately drove the price of the Company's stock down to just above $1.50 per share, after closing at $1.84 per share on the prior trading day.   Not surprisingly, the placement agent of this registered direct public offering was Dawson James, *see supra* at ¶ 57.[17]

178.    This $40 million offering consisted of:

- 18,852,273 Common Stock Units, consisting of one share of Pareteum's common stock together with one Series A Purchase Warrant to purchase

---

[17]   The shares of common stock and accompanying purchase warrants were sold together at a combined public offering price of $1.76 per unit, and the pre-funded warrants and accompanying purchase warrants were sold at a public offering price of $1.75 per unit with an exercise price of $0.01 per unit.  The pre-funded warrants were immediately exercisable and could be exercised at any time until all of the pre-funded warrants were exercised in full.  The Series A Purchase Warrants were exercisable six months after issuance, had an exercise price of $2.25 per share, and were exercisable for 5 years.  The Series B Purchase Warrants were exercisable 6 months after issuance, had an exercise price of $1.84 each, and were exercisable for 18 months.

> one share of Pareteum's common stock and one Series B Purchase Warrant to purchase one-half share of Pareteum's common stock; and

- 3,875,000 Pre-Funded Units, consisting of one pre-funded warrant to purchase one share of Pareteum's common stock together with one Series A Purchase Warrant to purchase one share of the Pareteum's common stock and one Series B Purchase Warrant to purchase one-half share of Pareteum's common stock.

179. Finally, on October 21, 2019, the full truth was fully revealed when the Individual Defendants were left with no choice but to announce "that the Company will restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019[,]" and that "[i]nvestors should no longer rely upon the Company's previously released financial statements [and related press releases, earnings releases, and investor communications describing the Company's financial statements] for the time periods cited above."  This press release further stated that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period[,] . . . [and that] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue."

180. This October 21, 2019, press release provided that Pareteum "estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million       [and] a reduction of approximately $24 million [for the first half of 2019]."

181. Following this announcement, shares of Pareteum tumbled in after-market trading, closing at $0.73/share on October 21, 2019, and opening at $0.37/share on October 22, 2019.

## E. Material Weakness in Internal Controls & Procedures, and Financial Reporting

182. On March 18, 2019, Pareteum filed its 2018 Form 10-K disclosing that throughout the Relevant Period there existed "material weaknesses in its internal control over financial

reporting, [such that its] disclosure controls and procedures were not effective as of December 31,

2018."

183.    The 2018 Form 10-K states, in pertinent part, that management, *i.e.*, the Individual

Defendants, had identified deficiencies that constitute material weaknesses in the Company's

internal controls over financial reporting, including:

- Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

- Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

184.    According to the 2018 Form 10-K, however, the material weakness "did not result

in any identified misstatements to the financial statements, and there were no changes to previously

released financial results."  Thus, despite reporting the prior deficiency that purported to affect

2018 but not necessarily 2019, the 2018 Form 10-K also reported that there had been no changes

in internal control over financial reporting.  Specifically, the 2018 Form 10-K stated:

> There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

185.    The 2018 Form 10-K also stated that Pareteum's management, *i.e*., the Individual

Defendants, had *already* been implementing and continued to implement corrective measures.

Specifically, the 2018 Form 10-K stated:

> Management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated, such that these controls are designed, implemented and operating effectively.

The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting.  This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) will continue to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) will institute sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhance our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.

We believe that these actions will remediate the material weakness.  The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.  We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

186.    The material weakness inherent in the Company's internal controls and procedures (hereinafter "Controls and Procedures") that existed at Pareteum throughout the Relevant Period, only served to cause investors to rely more heavily upon the Individual Defendants' assurances that the Company's financial statements were true, accurate, and reliable and that the Controls and Procedures in existence were at least minimally adequate to assure such transparency and reliability.

187.    In fact, the Individual Defendants encouraged reliance as evidenced by the Company's first quarter 2019 Form 10-Q, filed on May 10, 2019, in which the Individual

Defendants stated that, "[i]n light of the material weakness described [in its SEC filings], we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles."

<u>**VIOLATIONS OF GAAP AND SEC REPORTING RULES**</u>

188.    During the Relevant Period, the Individual Defendants materially misled the marketplace by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the Individual Defendants' statements, as set forth herein, not false and misleading. The Individual Defendants' statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

189.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

190.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

191.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a

discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

192.    Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

193.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28, Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

194.    The Company's financial statements contained in the quarterly 2018 reports, full-year 2018 reports, and quarterly 2019 reports filed with the SEC on Form 10-K and Form 10-Q for the periods throughout the Relevant Period, were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)    The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

195.    In addition, during the Relevant Period, the Individual Defendants violated SEC disclosure rules:

(a)     The Individual Defendants failed to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. § 229.303), and that failure to disclose the information rendered the statements that were made during the Relevant Period materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

196.    The Individual Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.  The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP.  The Individual Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements,

and filings with the SEC, which were disseminated to the investing public during the Relevant Period, were materially false and misleading for the reasons set forth herein.  Had the true financial position and results of operations of the Company been disclosed during the Relevant period, the Company's common stock would have traded at prices well below that which it did.

## MATERIALLY FALSE AND MISLEADING PROXY STATEMENT ISSUED BY DEFENDANTS TURNER, JIMENEZ-TUÑON, VAN SANTE, and LIPPERT

197.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, defendants Turner, Jimenez-Tuñon, van Sante, and Lippert likewise caused the Company to issue a false and misleading proxy statement.

198.    On June 6, 2019, defendants Turner, Jimenez-Tuñon, van Sante, and Lippert caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the  "2019 Proxy") in connection with the Company's annual shareholder meeting to be held on July 17, 2019.  Defendants Turner, Jimenez-Tuñon, van Sante, and Lippert drafted, approved, reviewed, and/or signed the 2019 Proxy before it was filed with the SEC and disseminated to Pareteum's shareholders.  Defendants Turner, Jimenez-Tuñon, van Sante, and Lippert knew or were deliberately conscious in not knowing, that the 2019 Proxy was likewise materially false and misleading.

199.    Among other things, the 2019 Proxy sought, among others, shareholder approval for the election of Turner, van Sante, Jimenez-Tuñon, and Lippert.

200.    In support of the Individual Defendants' bid to reelect defendants Turner, van Sante, Jimenez-Tuñon, and Lippert, the Individual Defendants highlighted their supposed oversight of the Company.  In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Pareteum faces, including legal and

regulatory risks, financial controls, and risks associated with compensation programs and plans.

The 2019 Proxy stated:

> The Audit Committee oversees our corporate accounting, financial reporting practices and the audits of financial statements. For this purpose, the Audit and Committee has a charter (which is reviewed annually) and performs several functions. The Audit Committee:
>
> · evaluates the independence and performance of, and assesses the qualifications of, our independent auditor, and engages such independent auditor;
>
> · approves the plan and fees for the annual audit, quarterly reviews, tax and other audit-related services, and approves in advance any non-audit service to be provided by the independent auditor;
>
> · reviews and approves related-party transactions;
>
> · monitors the independence of the independent auditor and the rotation of partners of the independent auditor on our engagement team as required by law;
>
> · reviews the financial statements to be included in our Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and reviews with management and the independent auditors the results of the annual audit and reviews of our quarterly financial statements;
>
> · oversees all aspects our systems of internal accounting control and corporate governance functions on behalf of the Board of Directors; and
>
> · provides oversight assistance in connection with legal, ethical and risk management compliance programs established by management and the Board of Directors, including Sarbanes-Oxley implementation, and makes recommendations to the Board of Directors regarding corporate governance issues and policy decisions.
>
> \*       \*       \*

### Code of Conduct

We have adopted a code of conduct that outlines the principles, policies and laws that govern our activities and establishes guidelines for conduct in the workplace. The code of conduct applies to all employees, as well as each member of our Board

of Directors. All employees are required to read the code of conduct and affirm in writing their acceptance of the code. Our code of conduct is posted on our website, www.Pareteum.com. We intend to satisfy any disclosure requirement under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of our code of conduct by posting such information on our website, www.Pareteum.com. A copy of our code of conduct is also available in print, without charge, upon written request to Pareteum Corporation, 1185 Avenue of the Americas, 37th Floor, New York, NY 10036, Attn: Corporate Secretary.

201.    The Individual Defendants' statements in the 2019 Proxy, which clearly represented that the Board had director responsibilities and duties that were adhered to, that the maintained proper and effective internal controls regarding financial performance and followed a pay for performance policy were false and misleading because the 2019 Proxy failed to disclose that the Company's financial performance was illusory and misstated.  By the time the 2019 Proxy was issued, the Individual Defendants already knew:  (1) the Individual Defendants had manipulated Pareteum's accounting for revenues, income, and the important Backlog metric; (2) the Individual Defendants materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results; (3) contrary to the Individual Defendants statements, the Company did not have adequate systems of internal operational or financial controls, necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable; (4) the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and (5) the Individual Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by the Individual Defendants, and therefore as a result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) was illusory.

202.    Had truthful disclosures been made by defendants Turner, Jimenez-Tuñon, van Sante, and Lippert in connection with the 2019 Proxy, the election of Turner, Jimenez-Tuñon, van Sante, and Lippert would not have been approved by the Company's shareholders.

## DAMAGES TO PARETEUM

203.    As a result of the Individual Defendants' wrongful conduct, Pareteum disseminated false and misleading statements and omitted material information that would make such statements not false and misleading when made.  The improper statements have devastated Pareteum's credibility.  Pareteum has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

204.    Indeed, the Individual Defendants' false and misleading statements as alleged above, has subjected Pareteum to the Securities Class Action.

205.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Pareteum has incurred damages from, *inter alia:*  (1) costs and expenses related to the restatement of Pareteum's financial statements; and (2) excessive and unwarranted compensation given to the Individual Defendants based on the Company's artificial financial condition and prospects.

206.    Pareteum's market capitalization has also been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

207.    Moreover, these actions have irreparably damaged Pareteum's corporate image and goodwill.  For at least the foreseeable future, Pareteum will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that Pareteum's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF DEMANDS AND DERIVATIVE ALLEGATIONS

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

210.    Plaintiff owns Pareteum common stock and was an owner of Pareteum common stock at all times relevant hereto.

211.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

212.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Pareteum Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

213.    At the time this action was commenced, the Board consisted of four directors: defendants Jimenez-Tuñon, Lippert, and van Sante (the "Director Defendants"), and non-party Mary Beth Vitale (together with the Director Defendants, the "Current Board").  The Director Defendants and the Current Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**Demand is Futile as to Defendants Jimenez-Tuñon, Lippert, and van Sante Because They Each Face a Substantial Likelihood of Liability**

214.    Defendants Jimenez-Tuñon, Lippert, and van Sante all face a substantial likelihood of liability for their individual misconduct.  Defendants Jimenez-Tuñon, Lippert, and van Sante were directors either throughout, or part of, the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

215.    Moreover, defendants Jimenez-Tuñon, Lippert, and van Sante, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

216.    Defendants Jimenez-Tuñon, Lippert, and van Sante are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above.  All of these defendants signed the false and misleading 2019 Proxy.

217.    Defendants Jimenez-Tuñon, Lippert, and van Sante were conscious and knowing in the making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure

to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the defendants Jimenez-Tuñon, Lippert, and van Sante face a substantial likelihood of liability. If defendants Jimenez-Tuñon, Lippert, and van Sante were to bring a suit on behalf of Pareteum to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to defendants Jimenez-Tuñon, Lippert, and van Sante.

## Demand Is Excused as to Defendants Jimenez-Tuñon, Lippert, and van Sante Because as Members of the Audit Committee They Face a Substantial Likelihood of Liability

218. Defendants Jimenez-Tuñon, Lippert, and van Sante, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowing defendants Turner, Bozzo and O'Donnell to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Jimenez-Tuñon, Lippert, and van Sante were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, defendants Jimenez-Tuñon, Lippert, and van Sante, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Jimenez-Tuñon, Lippert, and van Sante.

## Demand is Futile as to the Director Defendants for the Following Additional Reasons

219. If Pareteum's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability

Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Pareteum against the Individual Defendants, known as the "insured versus insured exclusion."

220.    As a result, if the Director Defendants were to sue themselves or certain of the officers of Pareteum, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

221.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Pareteum by prosecuting this action. Therefore, demand on Pareteum and its Board is futile and is excused. Pareteum has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

222.    The Director Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and

in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

223.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.  In violation of the Code of Conduct, the Director Defendants failed to comply with the law.  Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

224.    Pareteum has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Pareteum any part of the damages Pareteum suffered and will continue to suffer thereby.  Thus, any demand upon the Director Defendants would be futile.

225.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

226.   The acts complained of herein constitute violations of fiduciary duties owed by Pareteum's officers and directors, and these acts are incapable of ratification.

227.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Pareteum.  If there is a directors' and officers' liability insurance policy covering the directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."   As a result, if the Director Defendants were to sue themselves or certain of the officers of Pareteum, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

228.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Pareteum to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

229.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least two of the Directors cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## CAUSES OF ACTION

### COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

230.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

231.    The Individual Defendants owed and owe Pareteum fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Pareteum the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

232.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

233.    Each of the Individual Defendants had actual or constructive knowledge that:  (1) the Individual Defendants had manipulated Pareteum's accounting for revenues, income, and the important Backlog metric; (2) the Individual Defendants materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results; (3) contrary to the Individual Defendants statements, the Company did not have adequate systems of internal operational or financial controls, necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable; (4) the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and (5) the Individual Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the

guidance sponsored and/or endorsed by the Individual Defendants.  These actions caused severe risks to the Company and are actually causing harm to the Company by subjecting the Company to the Securities Class Action.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

234.    The Individual Defendants caused or allowed Pareteum to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its past growth, the reasons for its growth and Pareteum's future financial growth.

235.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

236.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Pareteum has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their fiduciary duties owed to Pareteum and its shareholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Pareteum's business, rendering them personally liable to the Company.

### COUNT II
### Against the Individual Defendants for Unjust Enrichment

237.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

238.    The Individual Defendants received performance-based compensation tied to the financial performance of Pareteum.  Because Pareteum's financial results were inflated during

the Relevant Period as a result of the wrongdoing alleged herein, the Individual Defendants received more compensation than they would have received had the truth that: (1) the Individual Defendants had manipulated Pareteum's accounting for revenues, income, and the important Backlog metric; (2) the Individual Defendants materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results; (3) contrary to the Individual Defendants statements, the Company did not have adequate systems of internal operational or financial controls, necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable; (4) the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and (5) the Individual Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by the Individual Defendants, been disseminated in a timely manner. Therefore, the Individual Defendants were unjustly enriched at the expense of and to the detriment of the Company.

239. The Individual Defendants knew or should have known that the Company's representations were false and misleading, all of which resulted in Pareteum's financial results and performance being artificially inflated due to the wrongdoing identified herein.

240. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Pareteum.

241. To remedy the Individual Defendants' unjust enrichment, the Court should order the Individual Defendants to disgorge any performance-based compensation that was received

during, or as a result of, the Individual Defendants' breach of fiduciary duties and other violations of law complained of herein.

## COUNT III
### Against the Individual Defendants for Violations of § 14(A) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

242.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

243.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

244.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

245.    The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy. In the 2019 Proxy, the Board solicited stockholder votes to elect defendants Turner, van Sante, Jimenez-Tuñon, and Lippert.

246.    The Individual Defendants' statements in the 2019 Proxy, which clearly represented that the Board had director responsibilities and duties that were adhered to, that they maintained proper and effective internal controls regarding financial performance and followed a pay for performance policy were false and misleading because the 2019 Proxy failed to disclose that the Company's financial performance was illusory and misstated.  By the time the 2019 Proxy was issued, the Individual Defendants already knew:  (1) the Individual Defendants had manipulated Pareteum's accounting for revenues, income, and the important Backlog metric; (2) the Individual Defendants materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results; (3) contrary to the Individual Defendants statements, the Company did not have adequate systems of internal operational or financial controls, necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable; (4) the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and (5) the Individual Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by the Individual Defendants, and therefore as a result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) was illusory.

247.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2019 Proxy,

the Individual Defendants were aware of this information and of their duty to disclose this information in the 2019 Proxy.

248.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2019 Proxy were materially false and misleading.

249.    The omissions and false and misleading statements in the 2019 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2019 Proxy and in other information reasonably available to shareholders.

250.    As a direct and proximate result of the dissemination of the false and/or misleading 2019 Proxy the Individual Defendants used to obtain shareholder approval of improper election of defendants Turner, van Sante, Jimenez-Tuñon, and Lippert.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Pareteum and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering the Individual Defendants disgorge any performance-based compensation that was received during, or as a result of, the Individual Defendants' breaches of fiduciary duties complained of herein;

D.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 18, 2020                    Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
(302) 984-3800
*Attorney for Plaintiff*

**OF COUNSEL**
**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (914) 752-3041

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Melissa A. Fortunato
Garam Choe
885 Third Avenue
Suite 3040
New York, New York 10022
(212) 646-9449